**Willard B. THOMAS, Respondent,**

v.

**Lillian June THOMAS, Appellant.**

No. 22267.

Kansas City Court of Appeals.

Missouri.

March 7, 1956.

Benjamin F. York, St. Louis, Hayden C. Covington, Brooklyn, N. Y., for appellant.

No appearance for respondent.

BOUR, Commissioner.

Plaintiff, Willard B. Thomas, brought suit against his wife, Lillian June Thomas, in the circuit court of Buchanan county, seeking a divorce and the custody of the parties' two minor children. Defendant filed an answer and cross-petition, praying for a divorce, the custody of the minor children, an allowance for the support of the children, alimony and attorneys' fees. Both parties relied upon alleged intolerable indignities as grounds for divorce. The trial court granted plaintiff a divorce and awarded him the general custody of the children. The custody order also provided that defendant should have "the right to have said children from 9:00 a. m. on Saturday of each week until 9:00 a. m. on Sunday of each week," and that defendant should have the further right to visit the children at all reasonable times. *Motion for a new trial was overruled, and defendant has appealed.*

Plaintiff and defendant were married on October 22, 1945. In 1946, plaintiff bought a house and lot at 3738 South 11th Street, St. Joseph, Missouri, for $4,000 cash, and title was taken in the names of plaintiff and defendant. The parties lived together in that house until their separation in 1954. Two children were born of the marriage;

namely, Dennis Michael, now nine years of age, and Stephen Daniel, now five years of age. Defendant had been married before, and she had a son, Gary, by her first husband. Gary was three years of age when his mother married plaintiff and twelve at the time of the trial. He lived with plaintiff and defendant from the time of their marriage until their separation, and plaintiff supported him during that period. Defendant received no money from her former husband for the support of Gary. At the time of the trial plaintiff was employed as a policeman by the city of St. Joseph, at a salary of $260 a month, and he had been so employed for four years. In 1954, he also "worked extra at Burris Mills" for about three months and was paid $130 to $140 a month for such work. Plaintiff was injured while serving in the Navy during World War II, and he received disability payments in the amount of $15.75 a month. In 1950, he bought a new Chevrolet automobile for $2,000 cash. He testified that he purchased the car and the property on South 11th Street with the proceeds of savings bonds which he acquired before he married the defendant. Except for a short period in 1946, defendant had never been gainfully employed since she married plaintiff.

The parents of both parties lived in St. Joseph. On September 5, 1954, plaintiff left the family home on South 11th Street and moved to the home of his parents, where he has since resided. After the separation, Dennis Michael lived at the home of plaintiff's parents for about a week and until the defendant went to the public school which the boy was attending and took him to her home. Thereafter, plaintiff went to defendant's home during her absence, obtained possession of their younger son, Stephen, and took him to the home of plaintiff's parents. The evidence showed that Stephen had been living with his father and paternal grandparents since that time. Defendant, Dennis Michael and Gary continued to live in the home on South 11th Street and they were living there at the time of the trial. Plaintiff instituted his action for divorce on Sep-

tember 7, 1954; defendant filed an answer and cross-petition on September 10, 1954; and the case was tried on October 21 and 22, 1954.

As stated, plaintiff and defendant were married in 1945. They evidently lived together amicably until July, 1950, when defendant became a member of a religious organization or sect known as Jehovah's Witnesses. Defendant testified at length concerning the teachings and doctrines of this sect, as did two of her witnesses, both of whom were members of the same organization. As we understand their testimony, Jehovah's Witnesses do not teach or advocate any violation of the laws of the state which are in harmony with the laws of God, but if the law of the state conflicts with God's law, as interpreted by the Witnesses, they will obey the law of God as so interpreted. They do not believe in saluting the flag of the United States, not because they do not honor the flag, but because of their conviction, based upon their interpretation of the Scriptures (Exodus, Ch. 20, verses 4 and 5), that saluting the flag is a form of idolatry. They do not believe in blood transfusions. Defendant testified that she was in favor of using suitable blood substitutes recognized by the medical profession.

The evidence showed that after defendant became one of Jehovah's Witnesses in July, 1950, she became quite active in the work of the sect; that she went from house to house distributing pamphlets and preaching the doctrines of the sect, sometimes taking the parties' children with her; that she distributed such pamphlets on the streets of St. Joseph; that on one occasion at least she had Dennis Michael distribute pamphlets on the streets; that she attended meetings of Jehovah's Witnesses at Kingdom Hall in St. Joseph; that between July, 1950, and the time of the separation, she made four trips out of town to attend regional meetings of Jehovah's Witnesses; and that she took her children with her on three of these trips. As stated in defendant's brief, the "evidence showed that she taught her children the beliefs of Jehovah's Witnesses, that she took them to the

meetings of Jehovah's Witnesses, and that she was training them to believe and act as Jehovah's Witnesses."

Plaintiff did not believe in the doctrines of Jehovah's Witnesses, as he understood them. He testified that he was opposed to having his children taught such doctrines; that he objected to the influence exercised by defendant over his children in getting them to accept the interpretation of the Scriptures made by the sect, particularly as such interpretation pertained to saluting our flag; that he requested defendant not to teach these doctrines to their children but that she continued to do so. There was quarreling in the family as the result of this difference of opinion.

Plaintiff testified: "Q. How many hours during the day or week would she be absent from your home in connection with this religious matter? A. Three or four times a week from half a day to a full day. She stated that sometimes she had been over in Kansas recruiting members, other times here in town getting in her hours. Usually she went on Sunday evening, Tuesday evening and Friday evening. That was meeting night. She stated she went down there. Where she went I don't know but she was gone mostly every Sunday, Tuesday and Friday evening from 7:00 until almost midnight.

"Q. What about the children? A. When I was there I would keep them. * * * I would take care of them when I was working the midnight to morning shift. When I was working 4:00 to 12:00 she took them with her * * *.

"Q. And that continued for a number of years? A. That is right * * *. When I was working 4:00 to 12:00 I didn't know where she went. She said she went to the hall * * *. I drove past there several times and I saw her in the hall several times. * * * Sometimes she missed and didn't go out but maybe once or twice during the week, but she was pretty determined and she made it most of the time." Defendant testified: "Q. Over the period of years since your immersion, what would you say had been the general

average of the time spent out in the service by you * * *? A. I would say approximately two hours a week." She also testified that she attended one-hour and two-hour meetings at Kingdom Hall on Tuesday night, Friday night and Sunday evening of each week. Plaintiff further testified: "Three or four times a week she wasn't there to prepare my meals. I never knew when I went home whether she would be there or not. "Q. If she wasn't there what would you do? A. Went to my mother's most of the time, now and then went to a restaurant." This testimony was corroborated to a certain extent by plaintiff's mother and two police officers who worked with plaintiff. Referring to plaintiff's testimony that on many occasions she failed to prepare his meals, defendant testified: "When I knew that he was coming home * * * I was always there" to prepare his meals.

Plaintiff testified that during the time he lived with defendant he performed his duties as a husband and father to the best of his ability; that he supported his stepson, Gary, for nine years; that he paid all of the household and family expenses; that he paid all of the bills because defendant "never had time, she said, to pay them"; that he paid for "her makeup and everything else"; and that he gave defendant $6 every two weeks "to spend on whatever she wanted"; that after they moved into the house on South 11th Street, he bought all of the groceries and carried them home. When he was asked on cross-examination whether "other people" had given defendant used clothing, he said: "I don't know. * * * I know she had a charge account at the Paris. * * * I just paid it off. * * * I let her charge things." Defendant testified that plaintiff gave her $6 every two weeks "for her personal needs" after she told him she would not do the washing and ironing unless he gave her that amount every two weeks. She said: "Before that it was about $3.00. * * * My husband forbade me to draw any money out of the bank without his permission. * * * If I had I would have gotten a beating."

Plaintiff testified that on many occasions defendant cursed him and called him vile names; that she called him "an unbelieving son of a b——— atheist"; that she said "it was wrong" to use such language but that he "caused her to do it" by "objecting to her running all over the country in that Witness business". Plaintiff denied that he was an atheist. He said: "I believe in God Almighty." Defendant denied that she "called him names and cursed him." Plaintiff further testified: "She kept telling them (the children) that I was no good because I carried a gun. * * * I suppose that was her belief. My boy (Dennis Michael) eight years old told me many times, 'You are no good, you carry a gun.'" Defendant denied that she told the children plaintiff was no good because he carried a gun.

Plaintiff testified that on one occasion defendant accused him of stealing "her purse with $24 in it," and continued: "Q. Where did she say that to you? A. Down at Mr. Carl Cole's. I was talking to him and she came down and as I remember it said, 'You stole my purse with that $24,' and says, 'He is keeping it for you,' and pointed to Mr. Cole, and of course I told her I didn't know anything about it. * * I never took her $24." Plaintiff's testimony concerning the statements made by defendant was corroborated by the testimony of Mr. Cole, who also stated that plaintiff never gave him any money for safekeeping. Defendant and her oldest son, Gary, earned part of the $24 by picking and selling raspberries. Defendant testified: "We were going to use it to go to an Assembly (a meeting of Jehovah's Witnesses). * * (O)ne morning I found him (plaintiff) with the wallet in his hand and the money in the other hand. * * * I said, 'You know I want that to go to the Assembly on.' So then he said, 'No, you are not going to get it.' * * * (H)e has rather small hands and I have rather large ones, and I was able to force his hand open and get the money out of it, and then I hid it in a different place, * * * and again he got it, and again I took the money out of his hands, and the third time the money disap-

peared completely after I hid it in the dining room cabinet. * *, *.'" (Plaintiff weighed 200 pounds and defendant weighed 107). Defendant further testified: "After I told him (plaintiff) I thought he took the money, he went down to Mr. Cole's house * * *. So I went down to his house and I said to Mr. Cole, 'Did he ask you to hold any sum of money for him,' and Mr. Cole said, 'No,' and I said, 'Well I think he has taken my money * * *.'" Plaintiff testified on cross-examination: "Q. Was there ever any occasion when your wife came to you and said, 'You have got my $24' and took the $24 out of your hand? A. No, I don't remember that." There was other testimony concerning the $24 but it need not be stated here.

This is plaintiff's description of another incident that took place at the parties' home: "We were in the living room, I think some of them watching television, my mother and sister and myself, and she (defendant) had started around the house * * * to go to a meeting, Jehovah meeting somewhere, and she saw them in there and came back in and said, 'I am tired of your damned relations here.' She said, 'I don't want any unbelievers here that don't believe in Jehovah's Witnesses.' * * She says, 'You I hate more than any' to my sister, and she made a lunge at my sister and I grabbed my wife to protect my sister and prevent a fight. "My sister and mother and dad took out. * * * (They have) not been back since. * * * Q. When did that happen? A. It was about three years ago, I imagine." Defendant did not deny these charges. The testimony of plaintiff's mother and sister concerning this incident was substantially the same as that of plaintiff.

Prior to their separation the parties had a television set in their home. When plaintiff was asked what defendant did when "the Star Spangled Banner was played and the American flag was shown on television", he said: "She started beating on pans and booing and most of the time jerked the plug out of the wall so the television set wouldn't operate. * * * She would grab them (the children) and take

694

them in the other room. * * *. She said that (the television set)' was the work of Satan. * * * (E)very time a preacher came on or the flag or a Catholic priest * * *, she would turn it off or yank the plug out * * *." Defendant denied all of this. She testified that "when Bishop Sheehan came on, or any minister", she "went out of the room" because she "didn't want to listen". When plaintiff was asked whether there had been "any improvement in her conduct and her attitude toward (him) and the family", he replied: "It got worse and she got colder all the time. She wasn't affectionate to me or the children at all."

In July of 1953, plaintiff took defendant and the three children on a motor trip to Yellowstone National Park; and in July of 1954, he took them on a trip to Colorado Springs. Defendant testified that she was "very unhappy" on the trip to Yellowstone, because she wanted to attend a meeting of Jehovah's Witnesses in New York; that plaintiff said the only reason he was taking the family to Yellowstone was to prevent her from attending "the New York Assembly". She testified that she wanted to make the trip to Colorado Springs, then stated that she suggested that plaintiff take his mother, and that she did not "care anything about trips anyway".

As stated, plaintiff left the family home on September 5, 1954, and went to the home of his parents where he has since resided. As to the separation, plaintiff testified: "I came home to get my clothes to go to Burris Mills and she came a short time after I was there, and I objected to her staying at that hall until 10:00 that night, and that is when the trouble started, and she picked up a croquet mallet and tried to hit me and said I was always standing in her way, and I pushed her down on the divan * * *. "Q. Did your wife have the youngest child in her arms when she came in that night? A. No, she was leading him, if I remember right. * * *. "Q. Did she fall on the divan that night? A. She fell on it when I pushed her. It has got an arm on it. She could have bruised herself." He further testified:

"That night I got tired of it and I left." This is defendant's version of the separation: "The children and I came home from Kingdom Hall about 9:30 or a quarter to 10:00 * * *. He (plaintiff) came out of the bathroom after I had seated myself on the divan and rushed at me and said, 'You dirty so and so.' * * * (H)e struck me in the chest with his fist and then he proceeded to hit me on top of the head also, and in doing that he slapped the baby * * *, and he rushed out when the baby started to cry. * *. * As he went out the door, he said, 'That is all, I am through,' and he left." Plaintiff denied these charges.

Defendant testified that on numerous occasions plaintiff called her vile names, such as son of a b———; that he had called Jehovah's Witnesses bad names in the presence of his children; and that he frequently struck her. She stated that on one occasion plaintiff struck her across the hips and legs and arms with a ramrod; and that when she asked him why he did that, he said because she went to a meeting after he told her not to do so. On another occasion, according to defendant, plaintiff hit her with a yardstick while she was asleep. She said he hit her because he had cut his finger on a razor blade which she had left in the bathroom. Defendant testified: "One time when I got back from an assembly my screaming woke the children and they came running in because of it, and he had me down on the floor just knocking the stuffings out of me, you might say." In describing another incident, defendant said: "One of the parakeets had gotten out of the cage during our absence and he was sitting on the floor, and the cat pounced right on him. * * * My husband blamed me for it and he picked up the bird cage and hit me over the head with it and across the back, and then he took the bird cage and proceeded to stamp it all to pieces." Plaintiff denied all of these charges. He said: "I have pushed her but I never struck her. * * *. I never did call her any names."

Plaintiff's stepson, Gary, age twelve, gave testimony in behalf of his mother concern-

ing the occurrence on September 5, 1954, when plaintiff left his home and went to live at the home of his parents. Gary testified: "I don't remember anything that was said. * * * She (defendant) had put the baby down on the divan and sat down with him, and he (plaintiff) came in and hit her on the chest." He further stated that on several occasions he saw plaintiff hit defendant and heard him curse her; that he never heard defendant use "any curse words"; and that no one had told him what to say when he testified at the trial.

There were other incidents, charges and denials on both sides before and after the separation, but those related present a fair picture of the conflict between the parties and are sufficient for the purposes of this opinion.

Frank L. Reiser, a police captain in St. Joseph, testified that he had known plaintiff about six years. He stated that plaintiff's reputation in the community was very good, and that plaintiff was an efficient police officer. Francis R. Ross, a neighbor and former employer of plaintiff, testified that plaintiff conducted himself properly and had always been "hardworking and a good provider".

Mrs. Mildred Bright, a school teacher, testified that defendant's son, Gary, was one of her pupils during the school year 1952–1953; that the parties' older son, Dennis Michael, attended the same school; that she saw Dennis Michael "on the playground and at lunch time"; and that the two boys "were well dressed and clean". Mrs. Mary Musser, Mrs. Opal Scruggins and Mrs. Wyvonia Jones, witnesses for defendant, testified that they had known defendant about five years; that they had never heard her use "any profane language or curse words"; and that her reputation for truth and morality was good. Defendant's sister, Mrs. Carolyn Shewmaker, stated that she had been in defendant's home many times and that defendant was a good housekeeper. Mrs. Shewmaker's daughter, Joyce, stated that "at various times" she had been at Kingdom Hall in St. Joseph when defend-

ant was there with the three children; that on such occasions the children were well dressed and well behaved; and that defendant's home was always clean and well kept. She admitted that plaintiff "always provided well for his family". All of these witnesses were members of the organization called Jehovah's Witnesses except Mrs. Bright.

Defendant contends (1) that "upon a review of the whole record this court should reach the conclusion that defendant was entitled to the divorce and the plaintiff was not entitled thereto"; (2) that "the court abused its discretion when custody of the minor children was awarded to the plaintiff"; and (3) that "the judgment of the court below denied defendant her right of freedom of worship and of religion, contrary to Article 1, Section 5 of the Constitution of Missouri and the First and Fourteenth Amendments to the United States Constitution." Defendant states that the "sole basis of the decree of divorce was that defendant left the house 'whenever she felt like it and over the protest of her husband' to worship Almighty God Jehovah"; and that "the record in this case shows that the only reason the children were taken away from defendant was that of her religion"; and consequently that the judgment appealed from denied defendant her constitutional "rights of freedom of worship and of religion".

If this case involved the "construction of the Constitution of the United States or of this state", this appeal would be within the exclusive appellate jurisdiction of the Supreme Court, Const.1945, Art. V, Sec. 3, 2 V.A.M.S., and it would be our duty to transfer the cause to that court. But, in order to preserve a constitutional question for appellate review the question must be raised at the first available opportunity, and the point must be presented in the motion for a new trial, if any. City of St. Louis v. Butler Co., 358 Mo. 1221, 219 S.W.2d 372. There is an exception to this rule; namely, where, on the whole case, some provision of the constitution was either directly or by inexorable implication

involved in the rendition of the judgment and decided against the appellant. Lohmeyer v. St. Louis Cordage Co., 214 Mo. 685, 690, 113 S.W. 1108. That exception has no application here. In the instant case defendant made no attempt to raise or present a constitutional question until she filed her motion for a new trial. In paragraph 7 of that motion defendant alleged that "the court's finding that the practice of her customary religion by the defendant constituted indignities, is against the law and in violation of" the constitutional provisions cited in defendant's brief. The trial court made no such finding. On the contrary, at the close of all the evidence, and after arguments of counsel, the trial judge said: "Under the Constitution of the United States any person has the right to worship as they please. * * *. The fact that a wife believes one way and the husband another way, insofar as religion is concerned, is no ground for divorce. * * * The sole question in a divorce case is whether or not the parties * * * have maintained their home and performed their duties toward each other." It is clear that no constitutional question can be presented on this appeal.

While each divorce action based on alleged general indignities must be determined on its own facts, the courts have said repeatedly that indignities, such as to warrant the granting of a divorce, ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The acts relied upon must amount to a species of mental cruelty, and must evidence a course of conduct by one of the parties toward the other whereby the other's condition is rendered intolerable through acts of such character and frequency as to be subversive of the family relation. Clemens v. Clemens, Mo.Sup., 235 S.W.2d 342, 346; Hoffman v. Hoffman, Mo.App., 224 S.W.2d 554, 561; Key v. Key, Mo.App., 93 S.W.2d 256, 259.

In the case at bar there was a direct conflict in the testimony on almost every charge and countercharge. If plaintiff's evidence be accepted as true, he was entitled to a decree of divorce. Plaintiff's evidence, as a whole, was substantial. It disclosed a course of conduct on defendant's part extending over a period of about four years, the cumulative effect of which may well have rendered plaintiff's condition intolerable. It is our duty, of course, to review the whole record and reach our own conclusions in divorce cases, but where, as here, the decision depends largely upon the credibility of the witness, we must give due deference to the conclusions of the trial judge who saw and heard all of the witnesses, and we are not authorized to set aside the judgment unless clearly erroneous. Section 510.310(4) RSMo 1949, V.A.M.S. Applying this rule, we defer to the conclusion of the trial court that plaintiff was the innocent and injured party and therefore entitled to a decree of divorce.

We turn to defendant's contention that the court erred in awarding the custody of the parties' children to plaintiff. As stated, after the separation plaintiff took the younger boy, Stephen, to the home of plaintiff's parents and Stephen has been living there since that time. Plaintiff's mother testified that she was employed "in the daytime" at "Montgomery-Ward"; that her husband did not work and was at home "all the time"; and that plaintiff always stayed at home with Stephen when he was not on duty. Plaintiff testified that he was living with his parents; that their home was a modern six-room house with three bedrooms, located a block and a half from Webster School; that if he were awarded the custody of the children they would be "properly supervised and have all their care and affection, and one of us will be with them at all times"; that his mother had been taking Stephen to Sunday School at the Second Presbyterian Church; that his mother was a member of a church at Halleck, Missouri, and about ten miles from St. Joseph; that when he was a boy he attended services at a Presbyterian Church; that when he was in the Navy he attended church services every Sunday, and continued: "I study the Bible but I haven't been attending church." As we have seen, at the time of the trial, defendant, Gary

and the parties' older son, Dennis Michael, were living in the home at 3738 South 11th Street. Defendant testified that if she were awarded the custody of the parties' children she would need money for their support, and that she "could get a job very easy". She did not say who would care for the children when she was working.

■ Defendant insists that the best interests of a child of tender years requires that it be placed in the custody of its mother. Ordinarily, as between the father and mother, the mother will be awarded the custody of such a child unless it be shown that she is unfit to take charge of the child or that she cannot provide it with a suitable home. It is well settled, however, that "the findings of the trial court in matters involving the custody of a minor child of divorced parents, while not binding upon the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition." Lutker v. Lutker, Mo.App., 230 S.W.2d 177, 179. Under the record in this case, we cannot say that the trial court abused its discretion in awarding the custody of the children to plaintiff.

The judgment should be affirmed, and the commissioner so recommends.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of BOUR, C., is adopted as the opinion of the court. The judgment is affirmed.

All concur.