19831. STANTON *v*. STANTON.

ARGUED SEPTEMBER 10, 1957—DECIDED OCTOBER 11, 1957.

*Nightingale & Liles,* for plaintiff in error.

*William R. Killian,* contra.

MOBLEY, Justice. The defendant in error (the plaintiff below) brought her petition as amended in Glynn Superior Court against her husband, seeking divorce, custody of their three minor children, support and maintenance for the children and attorney's fees. She alleged that she was a resident of Glynn County and had been for more than six months next preceding the filing of her petition, and that her husband was a resident of the State of Connecticut. She alleged cruel treatment as her ground of divorce. To the petition the defendant filed a plea to the jurisdiction, general and special demurrers, and an answer. The plaintiff filed general and special demurrers to the defendant's answer and a motion to purge surplusage from the answer. There were other demurrers and renewed demurrers to both the petition as amended and the answer as amended. The jury found against the plea to the jurisdiction, and in favor of divorce and support for the children. The court awarded custody of the children to the wife. The exceptions to this court are to the alleged errors of the trial court and the jury, on certain rulings of the court on general and special demurrers, on the motion to purge by the defendant in error, on general and special demurrers filed by the defendant, on the ruling of the court on the defendant's motion for mistrial, on certain rulings as to admissibility of evidence presented by the defendant, on the ruling on the defendant's motion for judgment notwithstanding the verdict, and on the motion for new trial. Counsel for the parties agree that nine questions are raised for decision by the numerous exceptions of the defendant. The answer to each of these questions will dispose of the various rulings excepted to by the defendant.

1. There is no merit in the defendant's contention that his plea to the jurisdiction should have been sustained. The

plaintiff testified that she moved to Glynn County, Georgia, immediately after her separation from her husband on October 13, 1955, and has resided there since October 14, 1955, which was more than six months before filing her petition for divorce on October 19, 1956; that she came to Glynn County with the intention of making it her permanent residence and has been a resident of said county since her arrival on October 14, 1955. Under the provisions of Code §§ 79-403 and 79-406, this evidence was ample to support the verdict finding that she was a resident of Glynn County and had been for more than six months prior to filing her petition.

2. There is no merit in the defendant's contention that neither the petition for divorce nor the evidence sustained good ground of cruel treatment. The plaintiff alleged that the defendant had treated her in a cruel and inhumane manner, that such treatment was wilful, and was such as to reasonably justify apprehension of danger to her life, limb, or health. The specific acts of cruelty charged in the petition do not contradict the charge of cruel treatment as contended by the defendant, but support it. The defendant contends that there was no intentional or wilful infliction of cruel treatment by him, since in the acts charged he was only practicing and exercising his religious beliefs as a Catholic. "The law has not designated, and indeed could not make, divers religious opinions a legal cause for separation. The fundamental law of the land guarantees freedom of religion and the right to worship according to the dictates of one's own conscience. The manner, however, in which one spouse practices his or her religious belief, may constitute cruel treatment entitling the other to a separation or divorce. The fact that conduct which is actually cruel is motivated by an excess of religious zeal does not excuse it on any theory of a constitutional guaranty of religious freedom." 17 Am. Jur. 295, § 59. There was evidence that the husband not only tried to persuade the plaintiff to become a Catholic, but he continuously nagged at her about it, laughed at her, accused her of being afraid to listen to him, became highly emotional, paced the floor, would go into rages with her, and would carry on in this way long into the night, causing her physical and nervous exhaustion, which resulted in her having to be hospitalized; that, after her return from the hos-

pital, he continued such treatment, even though warned by her doctor that her health was being impaired, and she again had to be hospitalized. She testified to the following specific acts of cruelty: "He flew into a rage in the hall and took me by the shoulders and shook me like a rag doll. I don't know just what he was saying. He shook me with all the force he had, and I went through the door from the hall, down on the kitchen floor, and against the washing machine at the other end. He came in over me with a white face and clenched fists, swearing that he would strangle me"; and "All of a sudden he jerked off his glasses and threw them at me and stepped on the gas and started down the road about eighty miles an hour. He kept up that rate on the road all the way. I begged him to slow down, but he wouldn't. He said he was going down the road to hell, and nobody could stop him. It was about a four hour's drive to New Bedford, and when I got in I was just all out." On other occasions he falsely told her that her doctor had said that she was a pathological case, and on one occasion he called her a bitch. The evidence amply supported the charge of cruel treatment.

3. The petition on its face does not show condonation, and the trial court correctly overruled demurrers to the petition based upon that ground.

4. Where children are involved in the granting of a divorce decree, it is the duty of the trial judge to award their custody. As stated in *Burton* v. *Furcron,* 207 *Ga.* 637, 640 (63 S. E. 2d 650), "The custody is a vital issue to be determined when the divorce decree is granted, and the parties are entitled to a decision on this question as much so as on the question of divorce, or the amount of permanent alimony, if any, and such a decree becomes final on the facts then existing. Any attempt to modify the award of custody by declaring it temporary, leaving this issue indefinitely pending in abeyance, and seeking to retain jurisdiction for further investigation, will not divest the award of its finality." This court has repeatedly held that an order of the court awarding custody "Until further ordered by the court," or "for the present," and any other effort on the part of the court to retain jurisdiction of the question of permanent custody does not deprive the order of its finality. See *Goodloe* v. *Goodloe,* 211 *Ga.* 894, 897 (89 S. E. 2d 654), and cases cited.

Accordingly, where the trial court had jurisdiction of the parties and the minor children, and where a divorce decree was granted, the court properly refused to grant temporary custody to the father as prayed and properly made a permanent award of custody. There is no merit in the defendant's contention that the doctrine of forum non conveniens should have been invoked in this case and the case remanded to Connecticut for trial. The court was without authority to remand the case to a court in Connecticut, and the doctrine of forum non conveniens, even if in force in this State, would not be applicable under the facts of this case.

5. In his answer the defendant states that he does not deny that his wife is a fit and proper person to have custody of the children, but insists upon his right to their custody and that the antenuptial contract, agreeing to rear the children in his religious faith, should be enforced even though they might be awarded to the mother. This court has not heretofore passed upon this question. In those jurisdictions which have dealt with the question it is generally held that the welfare of the child is the controlling fact in determining the right to its custody, and for this reason contracts between the parents concerning the religious training of their children will not be enforced, and the parent to whom custody is awarded is not bound by a previous contract. 29 Harvard Law Review 492; Brewer v. Cary, 148 Mo. App. 193 (127 S. W. 685, 692); Boerger v. Boerger, 26 N. J. Super. 90 (97 Atl. 2d 419); Lynch v. Uhlenhopp, (Iowa) 78 N. W. 2d 491; McLaughlin v. McLaughlin, 20 Conn. Sup. 278 (132 Atl. 2d 420); Dumais v. Dumais, 152 Me. 24 (122 Atl. 2d 322).

In In re Nevin, 2 Ch. L. R. (1891) 299, it was held that an antenuptial contract that the children of the marriage should be brought up in a particular religious faith has been decided over and over again not to be in any legal sense a binding contract. In Agar-Ellis v. Lascelles, 27 W. R. 117 (1878), where it was sought to enforce a "treaty for marriage" wherein a husband gave the wife and her friends an unconditional promise that the children of the marriage should be brought up in the religious faith of the woman, it was held that on principle and authority, it is settled "so as to be beyond question or argument, that the antenuptial promise is in point of law absolutely void."

The Supreme Court of Missouri, in Brewer *v.* Cary, supra, after citing the above English cases, ruled against the enforceability of a prenuptial contract as is here involved, and stated (p. 215): "Nor can we, in determining what is for the welfare of the infant, determine that on considerations of religion. That would involve our determination between religions—and that we are not permitted to do. . . That when the question of its [the child's] welfare turns on the direction of its training and up-bringing in one belief or another, our courts, save as controlled by statute, have no power; that to do so would be a determination by the courts as to differences in religious belief, which is incompatible with religious freedom."

It is the law in this State that, in awarding custody of minor children, the primary and controlling question is their welfare, and it is "the duty of the court . . . to look to and determine solely what is for the best interest of the child or children, and what will best promote their welfare and happiness, and make award accordingly." Code (Ann.) § 74-107. Thus, in a contest between parents as to custody, their wishes are subrogated to this paramount issue. Parents can not by contract control the discretion and duty of the court in determining the question of custody, and the court may disregard the contract and award the children to either parent or to a third party if the best interest of the children requires it. *Fortson* v. *Fortson,* 195 *Ga.* 750, 756 (25 S. E. 2d 518). Likewise, parents can not by contract relating to the religious training of their children restrict the discretion of the court in awarding custody, and the court may disregard entirely any such contract. This does not mean that the court may not properly consider the religious atmosphere in which the children will be reared. Our legislature, in providing for the placement of children under the jurisdiction of juvenile courts, has recognized the value and importance of religious training, and has provided: that, "In placing a child under the guardianship or custody of an individual or of a private agency or institution, the court shall whenever practicable select a person or an agency or institution governed by persons of the same religious faith as that of the parents of such child, or in case of a difference in the religious belief of the parents, then of the religious faith of the child, or if the religious faith of the child

is not ascertainable, then of the faith of either of the parents." Code (Ann.) § 24-2423. However, this does not indicate any intention on the part of the General Assembly to restrict the discretion of the trial judge in the placement of children.

The plaintiff in error complains that the court gave no consideration whatever to the antenuptial contract in awarding custody of the children, and that the evidence did not show that enforcement of the agreement would be detrimental to the children. There was evidence as to what religious training the mother had been giving the children since the separation, and in awarding custody to her it can not be said that the court did not consider the religious training they would receive with the mother, as well as that which they would receive if awarded to the father.

Applying the above-stated principles to this case, the trial court did not err in striking from the defendant's answer the antenuptial contract and those allegations which sought to enforce the provisions of the contract relating to the religious training of the children.

6. The court did not err in excluding from evidence a letter written by the defendant to his wife on October 18, 1955, five days after she had left their home in Connecticut and taken the children to Georgia. The letter was clearly self-serving and for that reason was not admissible. Nor was it admissible as a part of the res gestae. *Electric Ry. Co.* v. *Carson,* 98 *Ga.* 652 (27 S. E. 156).

The defendant contends that the court erred in excluding from evidence certain motion pictures offered by him. According to the record, these pictures were taken at various times beginning at Christmas in 1949 and continuing through Christmas of 1954, and were largely pictures of the children, some together and others separately, riding a bicycle, playing in the snow, in swimming, in the yard, and at home. It is not shown how or in what manner these pictures were related to the issues in this case, and we are unable to see how isolated pictures of the children playing at various times over a four-year period, when not connected with the alleged acts of cruelty or the question of custody, would throw any material light on the issues. As presented they were irrelevant, and the court did not err in excluding them.

7. The defendant contends that the trial court erred in failing to grant a mistrial, on motion duly made, on account of certain alleged prejudicial remarks made by the trial judge in the presence of the jury. It appears that in cross-examining the plaintiff with reference to a prenuptial agreement between her and her husband concerning their religious beliefs, which agreement was not introduced in evidence, the question was asked whether she remembered whether "the agreement contained the following agreement or promise." Upon objection of counsel for the plaintiff the trial court in ruling stated, "I am going to let him question her about it as a circumstance leading up to the marriage. I have ruled and am going to rule that she is not bound by it (the prenuptial contract). . ." The defendant contends that the statement of the judge that he had ruled that she was not bound by the contract was prejudicial, as it amounted to an expression of opinion by the court upon a matter with which the jury was not concerned and which they were not to consider. If, as stated by the defendant, the jury was not concerned with whether the contract was enforceable or not we can not see how the remark of the trial judge, that he had ruled that the wife was not bound by the contract, was harmful or prejudicial in any way to him.

8. In the absence of a timely written request, it was not error for the trial judge to fail to charge the jury the basis on which they should determine the amount of alimony or support for the minor children, that is, what amount would in the opinion of the jury, based on the evidence, provide for their necessities in life and for their support in the manner to which they were accustomed, and in accordance with the ability of the father to pay. The judge charged several times that, if the jury found in favor of the wife for divorce, they should fix the amount of support to be allowed the children, which should be any amount they saw fit to fix up to the amount asked, based on the evidence in the case. There was evidence as to the amount that would be sufficient to support, maintain, and educate the three children in the manner in which they had been reared and to which they were accustomed. There was also extensive evidence as to the earnings of the father, property owned, and what amount he was able to pay. The charge and the evidence were sufficient

to enable the jury to determine the amount of support to fix for the children. If more detailed instructions were desired, they should have been requested.

9. We can not say as a matter of law that, under the evidence before the jury, an award of $200 per month per child for their support was excessive. "The question of alimony can not be determined by a mathematical formula, as the facts and circumstances in each case are different. The jury is allowed a wide latitude in determining the amount to be awarded. . ." *Jeffrey v. Jeffrey,* 206 *Ga.* 41, 42 (55 S. E. 2d 566); *Day v. Day,* 210 *Ga.* 454 (5) (81 S. E. 2d 6). The defendant testified that his salary was $22,500 per year, and there was evidence that he owned considerable property, including real estate, money, stocks and bonds. The plaintiff testified that it would require $1,000 per month to maintain, educate, and rear the children in the manner in which they had been reared and to which they were accustomed. The award of $1,200 as counsel fees was not excessive under the facts of this case.

*Judgment affirmed. All the Justices concur. Duckworth, C. J., concurs in the judgment, but not in all that is said in the opinion.*