Leah Mae **ROGERS**, Plaintiff-Appellant,

v.

Elmer **ROGERS**, Defendant-Respondent.

No. 8721.

Springfield Court of Appeals, Missouri.

July 5, 1968.

James E. Curry, Ava, for appellant.

O. J. Adams, Kingston, Quentin Haden, Ava, for respondent.

HOGAN, Presiding Judge.

Plaintiff, Leah Rogers, brought this action against her husband, Elmer Rogers, in the Circuit Court of Douglas County, seeking a divorce and the custody of the parties' four minor children. The defendant filed an answer and cross bill, praying for divorce and custody of the children. Both parties relied upon alleged indignities as grounds for divorce. The trial court has granted the defendant a divorce and awarded him custody of the children. The plaintiff appeals.

The parties—referred to in the record as Leah and Junior—were married July 8, 1956. They established a home on a farm near Hamilton, Missouri, became parents, and apparently lived together quite happily until Leah became interested in Zion's Order of the Sons of Levi.

Zion's Order of the Sons of Levi is a religious order, chartered as a not-for-profit corporation. Mr. Marl Kilgore, then president of the organization, testified at length concerning its purpose and method of operation. The order was founded in New Mexico but was later moved to Missouri. It operates a large farm, or "ranch," not far from Ava, Missouri, on which 94 people lived at trial time. Though the order has a religious cast[1] it is "non-denominational," and "people do not have to give up their religion or unite with our type of religion to become a member." The order does have "rules and regulations," however, and, as Mr. Kilgore put it, "The rule is: everybody must abide by them who lives there because we have to have order with a group of that size." The organization is governed by an eight-man board of dir-

---

1. As witness Mr. Kilgore's description of its emblem: "The red depicts that it operates under the rules of our Teacher and Lord, Jesus Christ, and the white that He shed His blood for our sins, if we will accept him. And the blue is another symbol of looking to Christ for hope of eternity. The yellow is a golden opportunity through the operation of grace for the love of our Savior, Jesus Christ. Green means life and living offered us. The red again depicts Christ in the center of all and around all."

ectors. Prospective members, if approved by the board, may join the order, or they may enter on a provisional basis for 13 months. The applicant must then join or leave. If he wishes to become a member, he must donate all his property to the order. All the present members have done so.

The members of the order lead a communal life, in the sense that the life of the individual is almost blended into that of the community. The order has a common treasury and a community storehouse. Having donated his property to the order, the individual member receives food, clothing and shelter for himself and his family. The members may work at one of several projects, a farming operation, a dairy and beef cattle operation, or an upholstery-making operation. Each operation is supervised by an individual person designated by the board of directors. Other members work at ordinary labor, sometimes in nearby communities, but no one receives any wages; there is no individual compensation for labor, and everything which is earned goes into the general treasury. Individual expenditures, except for emergencies, require approval of the board of directors. The order also observes rather strict dietary practices, although they do not force these restrictions on others.

Mr. Kilgore travels extensively in the course of his work. On one of these trips— the date is not shown—Mr. Kilgore stopped at the parties' home near Hamilton and stayed a short time. The reason for this first visit is somewhat obscure, but according to Junior, Mr. Kilgore pointedly inquired how many acres the defendant had and how much livestock he owned. Mr. Kilgore did not remember any such conversation, nor did the plaintiff. Mr. Kilgore made one other visit to the Rogers farm, again on a date not specified, and at some time in the course of events the plaintiff's family became members of Zion's Order and moved from Idaho to the order's ranch near Ava.

Thereafter the plaintiff began to make regular trips to the ranch, and as time went on her visits became more frequent and protracted. In September or October 1960, the plaintiff, accompanied by her husband, made a weekend trip to see the plaintiff's family. Later, the plaintiff's sister asked her to be a matron of honor at a wedding, and the plaintiff spent about two weeks at the ranch. On each of these two occasions, the plaintiff brought her two elder children. In April 1961, the plaintiff's mother, who had been in a hospital in Idaho, was released and came to the ranch to join plaintiff's father. Plaintiff joined her there and remained three or four weeks. In February 1962, plaintiff was expecting her third child. Depending upon whose version of the facts one accepts, the plaintiff went to the ranch because her husband suggested it, or on her own initiative because she wanted to be near her mother when the child was born. Whatever may have been her reason for going, the plaintiff stayed on this occasion. At trial time, she still lived at the ranch with her children.

From this point, the evidence is in conflict. Leah's evidence was that when Junior brought her to the ranch in February 1962, he stayed only a short time and left, without requesting or even mentioning that she return to their home at Hamilton. Junior testified that Leah was baptized into the order and had made up her mind to move to the ranch before she left in 1962, and that by the time she left the parties had "pretty well decided to break up." Junior went back to Hamilton, but in April he sold his farm and his livestock and went to live at the ranch. Plaintiff's evidence was that defendant sold their farm and their livestock without her knowledge. The substance of her testimony was that it had been the defendant's idea to change their residence, and that he had voluntarily undertaken to join the order without persuasion by her. Defendant, on the other hand, said that while his wife wanted to keep their family together, "she wanted me there where she could serve the Lord." His explanation for leaving Hamilton and moving to the ranch was that "she was [there]

and she was going to stay [there] so I had to—I sold out and came down [there]. * * I wanted to stay with her that much."

In any event, defendant attempted to acclimate himself to Zion's Order of the Sons of Levi, but was unsuccessful in doing so. He donated the proceeds from the sale of his property to the order and lived at the ranch for three and one-half years. For Junior, the order's way of life was disagreeable to the point that it finally became intolerable. He resented the authoritarian nature of the organization; the individual member, as he put it, "didn't have no say-so." " * * * You are told every move to make. You can't do anything without their permission." Defendant also objected to the health practices in which the order believed. The president of the order is a naturopathic physical culturist who worked a number of years as a chiropractor, and the record indicates that the membership is encouraged to accept his medical ministration in preference to that of orthodox physicians. Defendant's evidence was that "when our little kids [got] sick, they had to take physical culture as a means of doctoring. * * * If they develop measles or colds or anything, they fast, get nothing to eat for several days." The health practices of the order also caused Junior to become suspicious of the president's son, Nathan, who gave some sort of manipulative "treatments," though he was not a licensed practitioner of any of the healing arts. On one occasion, Leah suggested that Junior "go and get Nathan to give you a treatment on your back." Junior asked if his wife had "been in there" [Nathan's "treatment room"] before, and she answered that she had. It seemed to Junior that Leah and Nathan were "always together," and on several occasions "I'd come up the stairs * * * and catch them coming out of a little side room there where she had had herself put back together, I guess." Not unnaturally, this had caused Junior to suspect his wife of infidelity, though there is no proof of any actual infidelity, and none is claimed here. The defendant also

found the order's dietary practices objectionable. The order is vegetarian, and as Junior put it, "You may get up and have cold rutabagas for breakfast or carrots or what have you, and you may not have anything if you don't like it. The kids don't, either."

During all the time he was associated with the order, the defendant worked, usually in the timber cutting wood. In the spring, Junior and other members of the order were sent out to work for people who lived near the ranch. They were paid $1.25 an hour for their labor, but none of them ever received any of the money; it all went to the organization. Finally there came a time, in August 1965, when " * * * they was separating the good from the bad, as I understood it. Some of them went to mental institutions, some went to old folks' homes, and I went home." By this time, the defendant was very thin and "in a nervous condition." When he got home, that is, back to Hamilton, he consulted a physician and found he had contracted tularemia "and some other things." For two or three months Junior took "medicine and shots," and finally was able to return to work at St. Joseph. In September 1965, the plaintiff filed her petition for divorce.

■■ The plaintiff, meticulously comparing the testimony with the allegations of the cross bill, claims that the defendant did not prove any grounds for divorce and was not entitled to affirmative relief. We cannot agree. It may be that the defendant's proof does not follow the allegations of his cross bill, which was rather extravagantly drawn, but that is not determinative. The defendant's evidence was received without any objection that it was not within the pleaded issues. With some limitations not material here, the rule is that when issues not specifically pleaded are tried by express or implied consent, they are treated as if they had been expressly pleaded. Rule 55.54, V.A.M.R.; § 509.500, RSMo. (1959); Domijan v. Harp, Mo., 340 S.W.2d 728, 733 [6]. Nor is it of any particular significance that the defendant characterizes

his grounds for divorce as a species of statutory desertion, for in a case of this kind, particularly where no findings of fact or conclusions of law were requested, we are not concerned with the reasons the trial court may have had in mind when he granted the decree, if the judgment is correct on any theory. Edgar v. Fitzpatrick, Mo., 377 S.W.2d 314, 318 [12]; Brown v. Montgomery, 354 Mo. 1041, 1050–1051, 193 S.W. 2d 23, 27 [3]; Niedt v. American Ry. Express Co., Mo.App., 6 S.W.2d 973 [1]. Our inquiry is whether, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses, the finding that the defendant was an innocent and injured party is clearly erroneous. Rule 73.01(d), V.A.M.R.

Our divorce statute, § 452.010, RSMo. (1959), provides that a divorce may be granted if one spouse " * * * shall offer such indignities to the other as shall render his or her condition intolerable * * *." The term "indignities" as employed in the statute is purposely indefinite and general, for "[t]he habits and feelings of different persons differ so much, that treatment which would produce the deepest distress with one would make but a slight impression upon the feelings of another. * * * The legislature * * * by the general words employed, evidently designed to leave each case to be determined according to its own peculiar circumstances." Hooper v. Hooper, 19 Mo. 355, 357. Otherwise put, the word "indignity" is not susceptible of precise definition, and in every instance involving alleged indignities, all the detailed circumstances must be considered in the appropriate setting of their background. Clemens v. Clemens, Mo., 235 S.W.2d 342, 346 [2].

In this case, the parties' difficulties arose out of religious differences, and of course the fact that one spouse entertains religious views different from those of the other is not in itself a ground for divorce. Krauss v. Krauss, 163 La. 218, 111 So. 683, 685 [1], 58 A.L.R. 457; Anno., 25 A.L.R.2d 928, § 1 (1952); 24 Am.Jur.2d Divorce and Separation, § 46, p. 215. All the same, it is clear that the religious practices of one spouse may give the other grounds for divorce. In Thomas v. Thomas, Mo.App., 288 S.W.2d 689, cert. denied 352 U.S. 873, 77 S.Ct. 98, 1 L.Ed.2d 77, though the case involved a degree of violence not present here, the court obviously considered the defendant's activities on behalf of Jehovah's Witnesses as part of the plaintiff's grounds for divorce, as against the defendant's assertion that she was merely exercising her constitutional freedom of religion. In Stanton v. Stanton, 213 Ga. 545, 100 S.E.2d 289, 66 A.L.R.2d 1401, there was evidence that the defendant, a Catholic, continuously and emotionally tried to impose his religion upon the plaintiff, often flying into a rage and carrying on long into the night. The plaintiff became physically and nervously exhausted, and petitioned for a divorce on the ground of cruel treatment. On appeal, the defendant contended that no grounds for divorce had been proved, since in the acts charged he was only practicing and exercising his religious beliefs. The court, admitting that diverse religious opinions are not a legal cause for separation, went on to say, 100 S.E.2d at 291, " * * * 'the manner, however, in which one's spouse practices his or her religious belief, may constitute cruel treatment entitling the other to a separation or divorce. The facts that conduct which is actually cruel is motivated by an excess of religious zeal does not excuse it on any theory of a constitutional guaranty of religious freedom.' " In Wood v. Wood, 227 Md. 211, 176 A.2d 229, the plaintiff husband obtained a divorce on the ground of desertion. The defendant, the case report indicates, developed a consuming religious zeal which caused her to absent herself from home for long periods of time. She frequently took her teen-age son along, interrupting his studies. Finally, the husband called upon his wife to choose between her home and her religious activity. The wife thought a few minutes, and replied, "Well, I'm leaving, I'm going to work for the Lord." She thereupon left, return-

ing at least twice, each time after an absence of several months. Eventually the husband sued for a divorce. On appeal, the court held that the wife, having taken "the decisive step of leaving the home," was guilty of desertion, and continued, 176 A.2d at 231, "[the wife] evidently preferred as her chief occupation carrying on her very zealous religious life rather than living simply as the wife of a hard working farmer, with religion as a part of her life but not as a virtually all-consuming part of it. [The trial court could properly find] an intention on the part of the wife to terminate the marriage relation in order that she might devote herself to what she considered the work of the Lord. These facts were sufficient to establish desertion." Of the husband's failure to object to his wife's departure, the court said simply, 176 A.2d at 232, " * * * assent to what one cannot prevent does not amount to a voluntary agreement thereto." In Golden v. Arons, 36 N.J.Super. 371, 115 A.2d 639, the plaintiff wife sued for divorce on the ground of extreme cruelty. Both the husband and wife had been reared as Jews. While in military service in Korea, the defendant husband was converted to Catholicism. On his return, he attempted to force his new religion upon his wife; on a number of occasions, in the presence of others, he called his wife a "lousy Jew" and an unfit mother. At night while the wife slept, the husband would put a religious medal about his wife's neck in an attempt to make her wear it. Other incidents occurred. Eventually the wife's health was affected. On appeal, the court held that the wife was entitled to a divorce on grounds of extreme cruelty, stating, 115 A.2d at 640, that while freedom of religion and the right to worship according to one's wishes are guaranteed by the fundamental law, " * * * [r]elief for extreme cruelty can be stated as designed for the sensitive as well as for the insensible and apathetic whom nothing

but blows can affect," and "[w]here the conduct of a spouse is calculated to destroy the peace of mind and happiness of the other so as to utterly destroy the objects of matrimony, it amounts to extreme cruelty." These rulings which we have discussed at length are but examples; others of similar import may easily be found.[2] It seems clear to us, then, that while the law does not, and probably could not, make religious differences between husband and wife a ground for divorce or separate maintenance, still one spouse's manner of practicing his or her religious belief may constitute "indignities," as that term is used in § 452.010, RSMo. (1959), depending on the nature of the acts complained of and their effect upon the injured spouse. We think the principle is broad enough to cover the situation at hand.

It is unnecessary, for the purposes of this opinion, to restate all the evidence and consider all the possible inferences and conclusions which could be drawn from the record as a whole. The trial chancellor could reasonably have found that after several happy years of marriage to the defendant the plaintiff became interested, and later completely absorbed, in the teachings and beliefs of Zion's Order of the Sons of Levi. Finally she decided she could no longer live happily with her family as the wife of a hard working farmer, but could be content only as a resident member of the order, obedient to its discipline. There is no evidence that she overtly tried to compel her husband to join the order, but it seems clear that she preferred her life with the order to her home and family, and that she was willing to continue living with the defendant only if he also would join the order and submit to its rules.

Acquiescing in that which he could not prevent, the defendant joined his wife at the order's ranch and tried to acclimate himself to the life he was expected to lead.

2.  Wilson v. Wilson, 58 Cal.App.2d 641, 137 P.2d 700, 702–703 [1–3]; Krauss v. Krauss, supra, 163 La. 218, 111 So. at 685–686 [1, 3]; Di Croce v. Di Croce, 27 Misc.2d 1035, 209 N.Y.S.2d 624, 627 [2]; Mertens v. Mertens, 38 Wash.2d 55, 227 P.2d 724, 725–726 [1, 2]; Anno., supra, 25 A.L.R.2d 928, § 2, pp. 930–934.

He sold his farm and donated the proceeds to the order. For three and a half years he remained with the order for the sake of his marriage and his children. Deprived, at least in his view, of his rightful authority as a husband and father, made subject and subservient to a group of men he disliked and mistrusted and stripped of all economic incentive, the defendant found life with the order degrading and eventually unbearable. Ultimately, his physical health and emotional well-being were adversely affected. The evidence was sufficient to warrant granting a divorce on the ground of general indignities.

Of course, in this state the complaining spouse must be both injured and innocent to be entitled to a divorce, Franklin v. Franklin, 365 Mo. 442, 446, 283 S.W. 2d 483, 485–486 [6–8]; Simon v. Simon, Mo., 248 S.W.2d 560, 562 [1], but we find nothing in the defendant's conduct to bar a divorce on that ground. The plaintiff overstates the record when she asserts that defendant was guilty of non-support, false accusations of infidelity and deliberate abandonment. The defendant gave literally everything he had—as we compute the figure, some $8,350.00—to the order, including $600.00 for a hernia operation which his wife never received. Moreover, if the defendant had sent money after he left the ranch it would simply have gone into the communal treasury; defendant could have had no assurance whatever it would have gone to his wife or children, because the directors decide how and for what the order's money will be spent. As for the false accusations of infidelity, we think, as we have indicated, that any young husband might become suspicious if his wife had manipulative "treatments" privately administered by another layman. We would reiterate that there is no actual evidence of infidelity on Leah's part, and no claim of adultery is made in this court. We are not impressed by the plaintiff's further contention that the defendant simply abandoned his family. Junior's evidence, which the trial court was free to accept, was that he

was ill, despondent and out of funds when he left the order to seek medical advice and obtain gainful employment. Further, when the trial judge pointedly asked Leah if she would be willing to return to her husband, she answered, "I think I'd be happier where I'm at" because "I'd have more peace of mind." A complaining spouse may be adjudged an innocent party even though his conduct is not above all reproach unless it has been such as to entitle the other party, prima facie, to a divorce. Schwarz v. Schwarz, Mo.App., 427 S.W.2d 734, 739 [6]; Gregg v. Gregg, Mo.App., 416 S.W. 2d 672, 675 [9]. In the circumstances of this record, the defendant could have been found both an injured and innocent party.

The award of custody presents different problems. The trial court simply awarded custody of the minor children to the defendant, without making any provisions for access or visitation by the plaintiff. To be sure, there is a record basis for the custody order, but in our opinion specific provision for visitation by the plaintiff should have been made.

After the evidence was heard, this case was taken under advisement, and home studies were requested from the Division of Welfare. Reports were filed by the County Welfare Directors in Douglas, Caldwell and Clinton counties. These reports were received by agreement, so we need not consider their evidentiary status, had objection been made. They indicate, as environmental studies, that the home the defendant can and is willing to provide is considerably preferable to that in which the children now live. We cordially agree that in awarding custody of minor children no single consideration is more important than the home environment in which they will live. H— v. D—, Mo.App., 373 S.W.2d 646, 654 [7]. At the same time, there is nothing before us to indicate that the plaintiff is an unfit custodian of her children. We do not say there is any abuse of discretion in awarding general custody of the children to the defendant; indeed, it seems

the proper thing to do. Nevertheless, where both parents are proper and fit persons, the children's best interests are ordinarily served by making it possible for them to associate with both of their parents. Patterson v. Patterson, Mo.App., 375 S.W.2d 614, 621 [5].

Therefore, the judgment is affirmed; but in the interest of the minor children, the cause is remanded for modification to give the defendant the exclusive care, custody and control of the minor children, without interference on the part of the plaintiff, except that the plaintiff shall have the right to visit said children at reasonable times, and, if in the opinion of the trial court it seems proper, to further modify the decree to permit the minor children to visit with their mother, the plaintiff herein, for such fixed specified periods at such specified places as the court shall designate and deem suitable.

STONE and TITUS, JJ., concur.