ABRAHAM LAPIDES, Respondent, *v.* ROSE H. LAPIDES, Appellant.

(Argued May 13, 1930; decided June 3, 1930.)

*Peter P. Smith, James J. McLoughlin, Dominic B. Griffin* and *Henry Simon* for appellant. The finding of the Appellate Division that the defendant was suffering from epileptic fits at the time of her marriage is against the weight of evidence. (*Exchange B. & R.* v. *Rifkin,* 245 N. Y. 260; *Boyd* v. *Boyd,* 252 N. Y. 422.) Fraud must be established, not presumed. (*McGill* v. *McGill,* 179 App. Div. 343; Dom. Rel. Law, § 7; Civ. Prac. Act, § 1139; *Tucker* v. *United Life & A. A. Soc.,* 133 N. Y. 548; *Gumbiner* v. *Gumbiner,* 72 Misc. Rep. 211; *di Lorenzo* v. *di Lorenzo,* 174 N. Y. 467; *Svenson* v. *Svenson,* 178 N. Y. 54; *Domschke* v. *Domschke,* 138 App. Div. 454; *Watkins* v. *Watkins,* 197 App. Div. 489; *O'Connell* v. *O'Connell,* 201 App. Div. 338; *Rutstein* v. *Rutstein,* 221 App. Div. 70.) The fraud sufficient to annul a marriage after consummation must be material. (*Griffin* v. *Griffin,* 122 Misc. Rep. 837.)

*Guernsey Price* and *David Cohen* for respondent. Fraudulent concealment of epilepsy is ground for annulment. (*di Lorenzo* v. *di Lorenzo,* 174 N. Y. 467; *McGill* v. *McGill,* 179 App. Div. 343; *Elser* v. *Elser,* 160 N. Y.

Supp. 724; *People ex rel. Plumley* v. *Higgins*, 109 Misc. Rep. 328; *Weill* v. *Weill*, 104 Misc. Rep. 561; *Gould* v. *Gould*, 78 Conn. 242.) In matrimonial actions the court will realize that a husband alleging fraud on the part of his wife cannot bring that degree of proof which is often available in other types of actions. (*Allen* v. *Allen*, 101 N. Y. 658; *Moller* v. *Moller*, 115 N. Y. 466; *Gregory* v. *Binghamton Trust Co.*, 168 App. Div. 805; *Sommer* v. *Oppenheim*, 19 Misc. Rep. 605.)

CRANE, J. The maiden name of the defendant was Rose H. Dombroff, and she was thirty-five years of age at the time of her marriage to the plaintiff on the 27th day of June, 1926. Since the year 1911 she has been a teacher in the public schools of the city of New York. She taught in Public School No. 13, at Essex and East Hudson streets, Manhattan, and in Public School 146, at Eighteenth street between Sixth and Seventh avenues in the same borough. The official records of the Board of Education show that her attendance has been very regular, with few absences, and these accounted for either because of the Jewish holidays or because of slight indispositions resulting from the " flu " and a railroad accident. Her rating as a school teacher has been high, and she was never late in arriving at her work. The principal of Public School No. 13, the secretary of the Association of Retired Teachers, and the assistant principal of Public School No. 146 have supplemented these official records with their own testimony to Miss Dombroff's ability and regularity as a teacher.

Those of us who have attended the public school, or know anything about the duties of a public school teacher, realize that the supervision and training of a large class of boys or girls, drawn from all sections and conditions in our great city, is no easy task, and makes heavy demands upon mental and nervous energy. Miss Dombroff continued her teaching for fifteen years up to October of 1926. She returned to her duties as a public

school teacher in September of 1927, and since February 1, 1929, has been teaching at Public School No. 36, Bushwick avenue, Brooklyn.

During the interval between October, 1926, and September of 1927, things happened which have been the basis of this litigation. The plaintiff, Abraham Lapides, "kept company" with this school teacher for many months, seeing her frequently every week. He gave her an engagement ring, and in June of 1926 he married her. They lived together as man and wife, she fulfilling all the obligations, duties or privileges usually accompanying that position. She became pregnant, which caused her resignation as a school teacher in October of 1926, as above stated. One day that month she lost her engagement ring, and sent for her husband. Much excitement followed. He describes it in these words: "You know there should be excitement, a man of your ability should know there should be excitement when a person loses an engagement ring, the first ring she got." The wife became unconscious, fell to the floor, was put to bed, neighbors came in, relatives were sent for, even the policeman. It is said that she had a fit of some kind, that her eyes rolled, that she foamed at the mouth. Apparently there was no privacy. Dr. Washnitzer had been treating the wife, or consulting with her during the previous months of pregnancy. He was sent for. Another doctor, Dr. Mendelevitz, came in. The husband again describes the scene: "When I came back I found Dr. Mendelevitz attending to her, and just as soon as I entered the apartment, Dr. Washnitzer came running in from the outside, and he said to Dr. Mendelevitz, 'She is my patient.' And during that time they pulled her into the bedroom — here was the kitchen and there was the bedroom, and they pulled her right on, and Dr. Washnitzer said, 'She is my patient, leave her alone, and I am taking care of her.' Dr. Mendelevitz went away, and Dr. Washnitzer went into the bedroom, took

her mother and sister Mollie into the bedroom, shut the bedroom door, put a curtain on top of the bedroom and he kept — he said nobody should enter the bedroom, and he kept everybody out. Then a little later — pardon me, then a little later, Dr. Washnitzer came out from the bedroom, and he rushed right out. I gave him $10 for the fee. I have a check there. Would you mind showing the check? "

Shortly after this, the wife had double pneumonia, and in the latter part of February, 1927, gave premature birth to the child, which lived only twenty-two to twenty-six days. In April the husband says that while they were eating breakfast she got up from the table, went out of the room into her bedroom, where she fell on the floor, blood coming from her mouth, her eyes bulging. She was unconscious. Dr. Washnitzer says that the husband, with his lawyer, a Mr. Goldman, called upon him, and that he told them he thought the attacks were epilepsy. Thereupon the husband left the wife and brought this action to annul the marriage on the ground that the defendant was incapable of entering into the marriage state, as she was suffering from epilepsy, and that she fraudulently concealed the fact. The Special Term, after hearing all the evidence, dismissed the case, but the Appellate Division, on appeal, reversed the judgment and decided in favor of the plaintiff, annulling the marriage on the ground stated, one of the justices dissenting and one voting for a new trial. Rose Lapides, who has thus been found incapable of being a wife because of epilepsy, has proved to be an efficient teacher of our children in the public schools for over twenty years.

There is no evidence to justify this finding of the Appellate Division. Conceding that the spells in November of 1926 and April of 1927 were epileptic seizures, there is no probative evidence to show that the wife ever had such attacks before. Two school children were called by the plaintiff to prove that as a teacher she occasionally held

her head in her hand as though she were tired, and a work-man said that once when hanging curtains, the defendant fell to the floor. Hypothetical questions based upon the testimony of the husband and the neighbors were asked of experts who gave it as their opinion that the attacks in November and in April must have been epileptic spells. Upon a physical examination these same doctors could find nothing the matter with the defendant. A gynecologist from the Williamsburg Hospital, consulting obstetrician, said that the attacks were due to a toxemia frequently occurring during pregnancy and for several weeks thereafter. There is no evidence in the case sufficient to support a finding that the defendant had epilepsy prior to June, 1926. Neither does the proof show that a person having an epileptic fit must always have suffered from epilepsy. On the contrary, there is evidence from the plaintiff's expert that it may start at thirty-five years of age. Assuming, therefore, that Mrs. Lapides had epileptic seizures in October and in April, as above related, six months and more after she was married, there is no credible evidence to show that she had any such attacks prior to marriage or knew that she had epilepsy. A Mr. Kanterman, a stranger whom the defendant had never met, testified that after the defendant was put to bed on the November occasion, he asked her how she felt and how long she had been sick " with the sickness," and that she replied " quite a time — from childhood." Such a statement from such a source without any corroborating background was at most insufficient to justify the reversal of the Special Term. Judgment in favor of the plaintiff on the ground of the defendant's fraudulent concealment was, therefore, without evidential support, and must be reversed.

But even if we go a step further and assume that Miss Dombroff before her marriage had epilepsy in some form, would this in and of itself justify the annulment of the ·marriage? Section 7 of the Domestic Relations

Law (Cons. Laws, ch. 14) provides that a marriage is void from the time its nullity is declared by a court of competent jurisdiction if either party thereto is incapable of entering into the marriage state from physical cause, or if either party consents to such marriage by reason of fraud. To the same effect, see section 1139 of the Civil Practice Act.

This court has held that a person, suffering from a venereal disease, is incapable of entering into the marriage state. (*Svenson* v. *Svenson*, 178 N. Y. 54.) The reason is apparent.

Epilepsy, however, is not to be classed with any such loathsome contagious disease. The record in this case is barren of any evidence as to the nature of epilepsy or its general effect upon the physical or mental capacity of the person afflicted. Medical treatises inform us that it is a term applied generally to a nervous disorder characterized by a fit of sudden loss of consciousness attended with convulsions. There may, however, exist manifestations of epilepsy much less marked than this, equally characteristic of the disease, while on the other hand, many other attacks of a convulsive nature have the term " epileptic " applied to them. In some persons the epileptic fit may only occur once in a lifetime or once in the course of many years. (Encyclopaedia Britannica, " Epilepsy.") No incapacity from becoming a wife or performing the functions of the married state necessarily results from epilepsy. The general health and bodily vigor may remain unimpaired.

Epilepsy, in and of itself, is no ground for the annulment of a marriage in this State. There must be something more than a mere fit or a spell of " epilepsy." The nature of the disorder may have progressed to such a degree as to be extremely dangerous for the person to marry or to have sexual relations. Concealment of such a condition might amount to a fraud, as it is almost impossible to conceive of its success without some intentional deception or disguise.

Shall we say, however, that any person subject to epilepsy, or to fainting spells, or to bad temper, bordering on insanity, is incapable of marrying? While the law books may treat marriage as a civil contract, yet it is a contract which the public is interested in preserving. The fraud which may dissolve the marriage tie must relate to something vital. Mere non-disclosure as to birth, social position, fortune, good health and temperament cannot vitiate the marriage contract. The man and woman who marry take each other for better or worse, richer or poorer, to cherish in sickness or in health. If this be old-fashioned according to some moderns, it is still the hope and joy of the pledged loyalty. The law of this State affords no relief to subsequent disappointment. Sickness and misfortune are common to mankind and must be borne with courage and resignation. Most people have something to contend with. (See *McGill* v. *McGill*, 179 App. Div. 343.)

Even insanity existing at the time of marriage was not ground for annulment prior to 1928. (*Hoadley* v. *Hoadley*, 244 N. Y. 424; see, also, *Sleicher* v. *Sleicher*, 251 N. Y. 366.)

The inability to bear children is not such a physical incapacity as justifies an annulment. (*Schroter* v. *Schroter*, 56 Misc. Rep. 69; *Wendel* v. *Wendel*, 30 App. Div. 447; Paley's Cases on Domestic Relations, p. 47.)

Until our Legislature extends physical incapacity to cover specific diseases, we must hold that the words of the Domestic Relations Law relate to that condition of mind or body which prevents a spouse from entering into the marriage state and performing the functions of a wife or a husband. Some States have provided by statute that no man or woman, either of whom is epileptic, imbecile or feeble-minded, shall intermarry or live together as husband and wife when the woman is under forty-five years of age. (See *Gould* v. *Gould*, 78 Conn. 242, and collected cases.) Other States have provided for sexual sterilization of inmates of institutions supported by the State, who shall be found to be afflicted with an hereditary

form of insanity or imbecility. Virginia has such a law. (*Buck* v. *Bell*, 274 U. S. 200.) In the absence of some such legislation in this State, the courts are not justified in establishing a system of eugenics. We would be trespassing upon very delicate and dangerous ground indeed, should we judges, fallible like other men, undertake to say who should and should not marry. It is time enough for the courts to act when it is proved that one of the parties to a marriage was at the time incapacitated from entering into the marriage state by reason of physical deformities or diseases.

As stated before, the concealment of a disease or disorder, especially after inquiry or investigation, may be so marked as to amount to a fraud (*di Lorenzo* v. *di Lorenzo*, 174 N. Y. 467), but the evidence in this case does not justify a further consideration of the subject.

The judgment of the Appellate Division should be reversed and that of the Special Term affirmed, with costs in this court and in the Appellate Division.

CARDOZO, Ch. J., POUND, KELLOGG, O'BRIEN and HUBBS, JJ., concur; LEHMAN, J., not sitting.

Judgment accordingly.