Michael J. Montesaho, J.
In this contested action, the plaintiff wife seeks a separation from her hnshand, the defendant, on the ground of cruel and inhuman treatment, separate maintenance and custody of John Boss, Jr., the sole issue of the marriage. The defendant, by appropriate allegations in his answer, denied the material allegations of plaintiff’s complaint and counterclaimed for annulment of the marriage.
The parties hereto met while the defendant was in the armed services and after a brief courtship they were married in the city of Baltimore on the 15th day of June, 1946. The plaintiff and her parents resided in the city of Baltimore; defendant and his parents were then and are now residents of the city of Buffalo.
Immediately after their marriage they established their home in Buffalo where defendant has ever since been employed. As is not uncommon and not unnatural, the plaintiff, removed from her friends and family, did not readily adjust to her new home and environment. Within a year of her marriage, the trivial misunderstandings between them, loneliness and the urge to visit her parents, to whom she appears to be greatly attached, prompted her to leave Buffalo for Baltimore. Apparently while the defendant did not consent, he made no strenuous objections to this visit.
On the 13th day of June, 1947, during her stay in Baltimore, John, Jr., their only child, was born. Some five months after their son’s birth, at the request of the defendant the plaintiff returned to Buffalo. In September, 1950 she again returned to her parents’ home in Baltimore where later she was joined by her husband; they returned to Buffalo the following March. Throughout this time it is evident from the proof and plaintiff’s letters to her husband that she was unhappy in her new home, indifferent to his parents and most desirous of returning to *401 Baltimore and her parents. Her insistence made then and on numerous occasions thereafter that he find employment in Baltimore and establish a home there, met a deaf ear. Unable to persuade her husband to remove to Baltimore, she eventually prevailed upon him to permit her parents to live with them in Buffalo. The plaintiff’s parents moved to Buffalo and resided with the parties hereto from August, 1952 to February, 1954.
The proof indicates that while the parties quarreled over inconsequential matters prior to the advent of plaintiff’s parents, thereafter their presence not only magnified their petty differences but caused more serious difficulties between them. Eventually the defendant requested them to leave his home which further aggravated the already strained relations between husband and wife. Though they seemed never to have interfered, the fact that defendant’s parents lived across the street from their residence and that defendant visited them frequently, was not in the circumstances helpful.
The action was commenced in the month of September, 1955 and was brought to trial the following December. During and throughout this period the parties continued to reside in the same household. In such circumstances it is doubtful if the court could grant a judgment of separation based on the grounds of cruel and inhuman treatment. I find no decision in this department precisely in point but in Berman v. Berman (277 App. Div. 560 [1st dept.]) it was held that it is “ contrary to the policy of the law ” to grant a judgment of separation on the grounds alleged in plaintiff’s complaint if the wife continued to reside in the same apartment as the husband during the time of his alleged misconduct and since the trial. To the same effect is Sommer v. Sommer (285 App. Div. 809).
I am mindful of the authorities holding to the contrary (Lowenfish v. Lowenfish, 278 App. Div. 716) but it is unnecessary in this case to base the court’s decision on this pronouncement of the law. The proof adduced at the trial in support of plaintiff’s allegation, which is disputed, does not establish that the defendant has been guilty of cruel and inhuman treatment rendering it unsafe for his wife to live with him. Indeed with the single exception of the incident which occurred at the home of the defendant’s parents, the proof fails to show that the defendant ever was violent or physically attacked his wife. As to this incident there are divergent views; the defendant denies he used any violence and his version is corroborated by his father whose testimony and demeanor favorably impressed the court.
The only other proof amounts to the ordinary family quarrels and bickerings distorted and punctuated by the presence of the *402 plaintiff’s parents in the same household and more seriously, unfortunately, by their different religious beliefs. During the trial the court observed both parties very carefully. The bearing and attitude of the plaintiff impressed me as that of one who does not retreat when a disagreement or quarrel is imminent. While she may not initiate one, an invitation to a quarrel with her husband or neighbors finds her ready to join in combat. In short I found no inclination on her part to be discreetly submissive. On the contrary the husband seems mild, meek and perhaps too submissive. The proof shows him to be industrious, hard-working and within his earning capacity a good provider; attested by the fact that he worked not only at the Bethlehem Steel Company, his regular place of employment, but to augment his earnings he found extra employment at Sears-Roebuck.
But I need not assess the blame for their quarrels and disagreements since I find that the plaintiff has failed to establish her cause of action by a fair preponderance of the believable evidence. A separation on the evidence in the case, even if the court accepted all of it as favorable to the plaintiff, is not warranted. In the absence of proof of violence or threatened violence rendering it unsafe for the wife to live with her husband, the law governing separations in this State is fairly rigid and cannot be granted when the proof demonstrates nothing more than incompatibility and clash of personalities. “ The test of cruel and inhuman treatment where no blows are struck or threatened should be applied with great caution. Insulting and angry words may cause discomfort and annoyance, but their natural purpose and effect is neither to injure health nor to endanger reason. Incompatibility of temper is no ground for separation in New York. The misery arising out of domestic quarrels does not justify a termination of the legal rights and duties of husband and wife. For such ills the patients must minister unto themselves; our courts of justice offer no cure. To the well-established rule this case presents no exception.” (Pearson v. Pearson, 230 N. Y. 141, 148; see, also, Smith v. Smith, 273 N. Y. 380; “ Morgan ” v. “ Morgan ”, 191 Misc. 53.)
The defendant has counterclaimed alleging that he was induced and consented to marry the plaintiff upon her promise and representations that any issue of the marriage would be baptized, reared and educated in accordance with the precepts and doctrines of the Roman Catholic religion. The plaintiff is a Protestant, a communicant of the Episcopal Church; the defendant a Roman Catholic. Admittedly the plaintiff signed a prenuptial agreement whereby she promised and agreed to baptize and educate the issue of the marriage in the latter faith.
*403 The evidence is most convincing that the defendant is a practical and devout Catholic. He regularly attends St. John the Evangelist Roman Catholic Church, is a member of its Holy Name Society and receives the sacraments regularly and frequently. Adherence to the tenets of his religion is to him of paramount importance; so too its precepts which demand that his child be reared in his faith. In the circumstances, the inference may be fairly drawn, indeed the conclusion, that in the absence of such a promise by the wife, he would not have married the plaintiff. A promise of this kind cannot be treated lightly and although it is but a spiritual right, it is nonetheless as real and as valuable as any property right. (See “Ramon” v. “ Ramon ”, 34 N. Y. S. 2d 100, 104 and the cases cited and discussed therein.) “ The marriage contract is more than a civil contract, which deals merely with property rights.” (Shonfeld v. Shonfeld, 260 N. Y. 477, 486.) Indeed, section 53 of our Domestic Relations Law provides that ‘ A contract made between persons in contemplation of marriage, remains in full force after the marriage takes place.”
The precepts of the Catholic Church require baptism of a child almost immediately after birth. Compliance with her promise required the plaintiff to adhere to this rule of the church. Instead and obviously as her letter of July 17, 1947 to the defendant discloses, she failed to have the child baptized until some five months after its birth and then only when pressed by the defendant. Her letter is quite revealing; therein she wrote: “ Now the promise I am breaking is, I am not going to have Jack christened a Catholic. You can’t keep a promise you made to me, I can’t keep mine either, unless you leave Buffalo.” She failed, however, to make her threat good; reluctantly she permitted the child to be baptized in the Roman Catholic faith.
The threat to repudiate her prenuptial agreement hung constantly like the sword of Damocles over the defendant’s head. Thus on October 19, 1949, during a temporary separation and while living with her parents, she wrote her husband that since he was breaking his promise 11 to bring her ’ ’ back to Baltimore if she were unhappy in Buffalo, she would not keep her promise and “ so far as Jackie being raised a Roman Catholic that’s out * * * As of this Sunday Jackie will become an Episcopal.”
The defendant enrolled the child at St. John’s Parochial School but under some pretext, not satisfactorily explained, plaintiff succeeded in registering him at a Buffalo public school which he presently attends. The public school system of this city permits a child’s absence from school for a specified period of time each week to attend religious instructions. In order to *404 be excused from attendance, it is necessary for the parent to sign and file an instrument with the principal of the school. The plaintiff not only failed to sign such an instrument but instead wrote the boy’s teachers requesting that he remain in school while his classmates of the Catholic faith were released for religious instructions. It appears that the mother enrolled the child in this school and regularly accompanied him back and forth thereto.
Until some nine months prior to this action, the child, accompanied by his father, regularly attended church at all such times required by its precepts. During the last nine months, although the father repeatedly and constantly urged the child resume church attendance, he was unsuccessful. True it appears that the child himself refused to attend. The mother justified the child’s refusal upon two most trivial incidents, one occurring at the church school and one at home. The child was mildly disciplined on one of these occasions by a teacher-nun and on the other by his father. He has been openly defiant ever since and has demonstrated a dislike for his father, so the mother claims.
If this dislike is in fact true, and so it appears, I am convinced that the mother, by unduly magnifying the incident and by referring to it in the boy’s presence, has succeeded, intentionally I believe, in nurturing and instilling to the full, his receptive and immature mind with this dislike. Fortunately, I am confident not irrevocably so. But it is noteworthy that not the slightest effort was made by the mother to induce the'son to attend church. It may be fairly inferred that she encouraged the boy to firmly stand his ground, indeed to the point that his father’s entreaties met with open defiance.
From the quoted excerpts of her letters, her delay in baptizing the child, her refusal to sign the release instrument, her failure to persuade the youngster to attend church and from the evidence viewed in whole, there emerges a fairly discernible plan and design on the plaintiff’s part to repudiate and breach the prenuptial agreement.
The defendant contends that the sum total of her conduct is sufficient basis for a conclusion that she entered into the premarital agreement with the mental reservation, a secret intention never to perform it. While on the evidence, this argument is plausible, to vitiate a marriage on the ground of fraud based on promissory representations, the evidence must be clear and convincing. I do not here find a clear demonstration of falsity or deception by the plaintiff to warrant such conclusion (di Lorenzo v. di Lorenzo, 174 N. Y. 467; Lapides v. Lapides, *405 254 N. Y. 73; Woronzoff-Daschkoff v. Woronzoff-Daschkoff, 303 N. Y. 506).
The defendant’s counterclaim is therefore dismissed but I have considered the proof offered in support of the counterclaim in my determination of custody rights.
The conclusion which I have reached regarding the future matrimonial status of the parties has not been too difficult. But I am now confronted with the ever perplexing problem of custody of the innocent victim, the child of the marriage. To aid the court in its determination concerning custody, the parties stipulated that I might order an investigation by an appropriate agency and consider its report.
There is not the slightest suggestion that the father has not the natural affection which most parents have for their offspring. The proof persuasively indicates that the father’s proposed place of residence is far superior to that of the mother’s and would better promote the welfare of their son. The custody rights which I shall direct will afford an opportunity to the father, by his example and companionship, to demonstrate his paternal love and affection. Away from the daily influence of his mother, the father should restore himself in his son’s esteem and recapture his confidence and love.
There is no doubt that the mother too has warm natural love and affection for the child. She is a devoted and conscientious mother and competent to take good care of her child, though too possessive. However, in her desire to have such complete and exclusive control, the child is seldom permitted to play with other children and otherwise engage in activities normal to a child of such age.
The home which she intends establishing for herself and child and its environment, while satisfactory, do not appear to be as conducive to the child’s welfare as that of the father. Even so, I fear a complete separation of the mother and son might not prove beneficial to the child. Mindful of the obstacles and possible consequences, I have nonetheless concluded to award custody of John, Jr., to both and thus afford the child an opportunity to adjust himself, in due time, to one or both parents.
I shall keep open the custody periods and duration thereof and suggest that the parties agree thereto and so advise this court before the entry of the decree. In that connection, I suggest that the agreement contain an unqualified stipulation that the child, upon the father’s request and in accordance with the prenuptial agreement, be enrolled in a parochial school. If in a public school, that the mother execute any instruments necessary to secure his release for religious instructions; and *406 that during the period that she has custody, the mother be charged with the duty of educating and rearing the child in the Roman Catholic faith.
If the parties cannot agree on custody and incidental rights within 10 days from the date of this decision, I shall award complete custody to the father subject to visitation rights to the mother starting Friday of each week after dismissal from school and ending the following Sunday evening, and for six weeks during the usual summer school vacation period. The child, however, shall not at any time during which she shall have custody, be permitted to leave the jurisdiction of this court without the written permission of the father. During such time as the mother has custody, the father shall pay her at the rate of $15 weekly for his support. I make a further award of $100 as counsel fee to plaintiff’s attorney payable within 10 days from the date of entry of the decree herein.
The findings and conclusions of the court are sufficiently indicated herein. Settle decree providing for its amendment at the foot thereof in respect to the custody of the child.