J. Irwin Shapiro, J.
This is a motion by the defendant husband to punish the plaintiff wife “ as and for contempt of court for her failure to permit the defendant the right to visit with the infant John Henry Hehman on each and every Sunday for the purpose of attending to the religious education of said infant.”
It appears from the affidavits on this motion that plaintiff and defendant are and were at the time of their marriage Catholic and Lutheran, respectively; that by virtue of a decree of separation made by Mr. Justice Peter M. Daly on February 17, 1948, custody of the three children of the marriage, Kenneth, now 14; John, now 13; and Barbara, now 12, was awarded to plaintiff. Aside from general ‘ ‘ rights of visitation to see and entertain said children” the decree further provided that “in addition the defendant shall have the right to bring the child John Henry Hehman to the church in which he has been baptized, namely the Lutheran Church, for Sunday School when said child reaches the age at which said church customarily accepts children for Sunday School.”
*319 Defendant avers that plaintiff has surreptitiously been taking their son John to the St. Gerard Roman Catholic Church and that she seeks to enroll him in a Catholic High School, although the infant has attended the Sunday School classes of The English Lutheran Church of the Redeemer since September 12, 1948, and was formally confirmed in the Lutheran faith on March 30, 1958, and that this conduct of plaintiff is in violation of a prenuptial understanding that their elder son Kenneth was- to be raised in the Catholic Church and that John was to be raised in the Lutheran Church.
Plaintiff avers a promise on the part of defendant that John should have the right to choose his religion after his confirmation as a Lutheran, and the breaking of that promise by defendant. She implies that John wishes to become a Catholic.
No court can fail to be distressed by broken marriages and ruptured homes. These cases of deep unhappiness are rendered all the more tragic when diversity of religion is one of the causes which aids in destroying what should be the most joyous human relationship, and one of the most sacred of human institutions. When two people take each other as husband and wife until death do them part, the ensuing problems of deep changes in patterns of life, of widespread personality adjustments, of new and added responsibilities when children come, of financial needs as the family expands, are in themselves sufficiently exacting and trying. To add to these the great strain of difference in religion is to tempt fate. Religious intermarriage too frequently brings disagreement in its train. It is a serious enough burden on husband and wife, as between themselves, but where, as in the instant case, the home breaks up, religious differences may cause damage to the' children that is well nigh incalculable. If only young lovers could brush the rosy rapture of youthful love from their eyes long enough to realize these sobering facts, there would be fewer religious intermarriages, less marital misery and a reduced divorce and separation rate.*
*320 Defendant speaks of a prenuptial understanding, whereby the elder son Kenneth was to be a Catholic and John was to be a Lutheran. Plaintiff does not deny this averment. This agreement, moreover, has been partly executed, for Kenneth is being reared as a Catholic. But we are in a court of equity, not of law. It is settled beyond all question that in cases of broken homes, the interest of the child is paramount. The child is the ward of the court, and the court must look to his welfare and his rights before all else. This court, therefore, by stare decisis and also the promptings of its own judgment and feelings, must, in coming to a decision, disregard the provisions of any such prenuptial understanding insofar as they attempted to dispose of the children, or of deep-seated aspects of the children’s lives, up to the date of their majority, as if the children were inanimate counters or impersonal assets to be divided between the warring parents. Such an agreement the court holds to be subject at all times to the best interests of the child. The Jewish prayer book contains the phrase “ Touch not mine anointed,” and the rabbis of old interpret the word ‘ ‘ anointed ’ ’ in this phrase to mean the school children. Arbitrarily to assign different religious upbringing to children of the same household is certainly not leaving them unmolested.
Particularly is this true where, as here, there are three children, living together, two of whom have been reared in one faith and the third has been reared in another faith.
No court, in the exercise of its judicial function, can or will assess any one creed against another. Each must be held to be primus inter pares. To take any other position would be in direct violation of the Constitutions of our Nation and our State. ‘ ‘ The one great God looked down and smiled, And counted each his living child, For monk and Brahmin, Turk and Jew Had called Him by the Name each knew.”
Nevertheless, this court, mindful of the interest of the infant John, must bear in mind the day-to-day realities of his- existence." He is in constant contact with his brother and sister; they live in the same home. They are Catholic; he is not. They are presumably engrossed, to the extent that children can be, with the teachings and worship of their creed; so is he, or at least has been, with similar facets of Lutheranism. But in this tiny society of three siblings, he is outnumbered. In addition, their mother is Catholic. This court does not say that numbers, any more than might, make right, nor does it hold that God is on the side of the mightiest legions. “ In my Father’s house are many mansions,” says the Gospel of St. John, but we must be realistic *321 and recognize that diversity of religious outlook and practice is frequently an abrasive factor among adults, who certainly should hnow better. How much more then can it be so among children ? This is truly visiting the sins of the fathers upon the children. If each religion may claim validity in the development of one’s personality, the achieving of a sense of responsibility to society, and the formulation of a satisfying, uplifting and inspiring conception of Almighty Q-od, then reason dictates little difference whether these three children were originally brought up as Catholics or Lutherans —• except that two are now Catholic. From this point of view, this should no longer be a home divided against itself, and John should clasp hands with his mother and brother and sister before the same altar.
There remains, however, one consideration: John may not wish to become a Catholic. To require him to adopt that creed may seem logical, under the circumstances of this case, but since the welfare of the court’s ward is paramount, John cannot be forced to enter a religion against his wishes. John may wish to remain in the religion of his father despite his mother, brother and sister. That would be his right as an inhabitant of this country, and the day that he, or anyone similarly situated, loses that right will see our country a whited sepulchre. He is 13 years of age. True, he does not have the maturity of greater age and long experience, but he has had instruction and confirmation in the Lutheran Church. He has also attended the Catholic Church with his mother and has without doubt heard Catholicism discussed and expounded at home. He has been made acquainted with both oreedal points of view and forms of worship, and with the heart of a child he may speed directly to what is truth for him more quickly and accurately than we adults whose lives and actions, like Hamlet, are “ sieklied o’er with the pale cast of thought.”
In Martin v. Martin (308 N. Y. 136) the Court of Appeals affirmed an order permitting a child of 12 to choose his own religion. While there is much merit and logic in the dissenting opinion in that case, the prevailing opinion must be considered the law of our State.
It is the court’s decision that the choice of John Henry Helrman’s religion should be left to him and that such choice should be ascertained under circumstances and safeguards that will make certain that it is his wish, and not alone that of either parent, that the court is carrying out. The matter will, therefore, be referred to an Official Referee to hear and report on, that question and on all other questions raised by the papers *322 herein. In view of the fact that John’s enrollment at high school this September is involved, the parties are urged to arrange a hearing before the Official Referee with all convenient speed.
Submit order.

 AH of the major religions are sensitive to religious intermarriage. Thus, to cite only a few, the “ Code of Canon Law ” contains several canons forbidding Catholics to marry non-Catholics; The Methodist Church, in May, 1956, adopted a resolution stating in part, “* * * It is therefore strongly urged that each young person consider carefully before becoming engaged to anyone who does not have a similar religious background ”; and The United Lutheran Church, in October, 1956, adopted a resolution stating in part, “* * * Congregations and youth and student groups of the church should continue to carry on educational programs regarding the special problems in mixed marriages. The inevitable compromise on denial of the faith and the social and cultural problems usually accompanying such marriages should be thoroughly explained.”