Mary Jane Gottlieb, Appellee and Cross-Appellant, v. Jerry Robert Gottlieb, Appellant and Cross-Appellee.

Gen. No. 48,242.

First District, Second Division.
April 18, 1961.

Cohen & Berger, of Chicago (Samuel S. Berger and Warren Krinsky, of counsel) for appellant.

No appearance or brief was filed by plaintiff in Appellate Court.

MR. JUSTICE FRIEND delivered the opinion of the court:

Defendant appeals from an order of the Superior Court of July 1, 1960 which modified one of the provisions of a decree of divorce, entered in favor of plaintiff on September 29, 1955, with respect to the religious training of the two minor children. Plaintiff has not filed an appearance nor a brief in this court.

No evidence was adduced before the chancellor, but from the record it appears that the parties were married in Chicago on March 21, 1942 and lived together

as husband and wife until April 23, 1954. Two children were born of the marriage, Dianne in 1943 and Steven in 1949. In June 1955 plaintiff filed her complaint for divorce, charging desertion, and defendant answered. While the suit was pending, the parties entered into a written agreement affecting their property rights, and providing specifically for the religious training of their children, subject to the approval of the court. By stipulation, the matter was then heard without contest. On September 29, 1955 the court entered a decree for divorce which incorporated the terms of the written agreement. It provided that plaintiff should have the care, custody, and education of the minor children, with reasonable visitation rights reserved to defendant. He was to pay $440.00 per month for alimony and child support, in equal proportions, the income tax chargeable to plaintiff on the alimony payments, and $1000.00 in cash twelve months after the entry of the decree. Child support was to continue until each of the children reached the age of twenty-one years. Defendant was to provide, at his expense, a college and professional education for both children if they so desired, regardless of their age. He was also to purchase an automobile for plaintiff's exclusive use and assume payment of State license fees, city vehicle taxes, and all insurance. Defendant was further required to maintain a $10,000.00 life insurance policy for the benefit of plaintiff, and he gave her a written unconditional guarantee, executed by a relative, of all future payments of alimony and child support, as set forth in the decree, as well as the payments of premiums on the $10,000.00 life insurance policy. Defendant was also required to pay and discharge all extraordinary medical, dental, and hospital expenses for the children. Plaintiff was permitted to remove the children from the State of Illinois in her discretion, which she has done from time to time. The household furniture and

equipment was given to plaintiff. Each party released all interest in the property of the other, and defendant was to pay plaintiff's attorney's fees in the sum of $500.00. Defendant, on his part, faithfully carried out all the provisions of the decree; in fact, in 1957, he voluntarily increased the alimony and child support from $440.00 to $560.00 per month, and later in 1958, when Dianne took up residence with him, he reduced the payment to $500.00 a month, which he is presently paying.

The sole controversy arises over paragraph 13 of the agreement which was incorporated in paragraph 14 of the decree and reads as follows: "That the plaintiff, Mary Jane Gottlieb, raise Dianne Gottlieb and Steven Gottlieb, the children of the parties hereto, in the Jewish faith and the defendant, Jerry Robert Gottlieb, shall pay the annual temple dues." Notwithstanding this provision of the agreement and decree, shortly after its entry plaintiff enrolled Dianne as a student at Marywood School for Girls and Steven as a student at St. Nicholas School, both Catholic educational institutions. Dianne never attended Marywood School. She has almost reached her majority and is not involved in this proceeding. Steven, however, has uninterruptedly attended Catholic schools, and from 1958 the question of his religious upbringing was repeatedly brought before the chancellor in one form or another by means of various petitions, in some of which defendant sought to have plaintiff cited for contempt for violation of the decree. The issue, however, was continued generally, and determination thereof was not final until an order was entered on July 1, 1960 permitting plaintiff to enroll Steven "in a school of her [plaintiff's] own choosing." This is the order from which defendant appeals.

From the petitions of record, there emerges a discernible design on plaintiff's part to repudiate and

breach the agreement and decree. Steven has always attended Catholic schools, a practice to which defendant objected. Steven's mother petitioned the court to deprive the father, who maintained a Jewish household, of custody during the 1959 Christmas vacation for the reason that "to deprive the said minor child of the festivities usually and ordinarily indulged in by a Christian household during that period is unfair and detrimental to the best interests and well-being of said child." Plaintiff's possessive attitude toward Steven is evidenced by her unwillingness to allow him to continue any relationship with his father. It appears from one of the petitions that after she had established temporary residence in Lansing, Michigan, defendant made a trip there to visit his son; she refused to allow him to be with his son, except in the presence of a town constable. In open court plaintiff informed defendant that she intended to send Steven to a Catholic camp; he expressed his willingness to send the boy to a nonsectarian camp and to defray all expenses. In answer to one of defendant's petitions, when Steven was nine or ten years old, plaintiff averred that "the said minor child . . . presently chooses to practice the Roman Catholic faith," and about a year later, when plaintiff filed a petition to modify the decree, she alleged that "subsequent to the entry of said decree of divorce the minor child Steven Gottlieb embraced the Roman Catholic religion, that said minor child is presently enrolled and has so been for a long period of time, in a Roman Catholic Parochial school, that he is practicing said religion regularly, and that as an integral part of the practice of said religion the education in a parochial school is of utmost importance." She further contended that the choice of religion is guaranteed under the Constitution and is extended to minors as well as adults, and that the choice of religion of the children "falls within the prerogative of the said peti-

tioner [plaintiff]." She asked that an order be entered modifying the decree of divorce "in that Paragraph 14 of said decree be vacated; and that in lieu thereof, a provision be made providing that the minor children of the parties hereto be allowed to follow the religion of their own choosing, to-wit, the Roman Catholic religion, without interference from the defendant and respondent." No specific cognizance was taken of this request; the final order provided, as heretofore detailed, that plaintiff be allowed "to enroll the minor child . . . in a school of her own choosing."

 Section 19 of the Divorce Act (Ill. Rev. Stat. 1959, ch. 40) provides that "the court may, on application, from time to time, make such alterations in . . . the care, custody and support of the children, as shall appear reasonable and proper." Notwithstanding this statutory provision for the modification of a decree, the courts of this state have consistently held that such authority may not be invoked or exercised unless circumstances have arisen *after the entry of the original decree* which would require the modification thereof. This is so because the decree itself is determinative of all issues which have been raised and of the factual situation which was made known to the court prior to its entry. The Supreme Court, in Nye v. Nye, 411 Ill. 408, 105 N.E.2d 300 (1952), in discussing a requested modification of a decree with respect to custody of children, states the rule as follows (p. 416): "The decree is res judicata as to the facts which existed at the time it was entered but not as to facts arising thereafter. (People ex rel. Stockham ·v. Schaedel, 340 Ill. 560.) In proceedings involving child custody the order of the court or judge having competent jurisdiction is a final order, and is binding upon the parties under the same facts and so long as the same conditions exist as did at the time of the hearing and order. (Cormack v. Marshall, 211 Ill. 519.) New condi-

125

tions must have arisen to warrant the court *changing its prior custody determination.* (Stafford v. Stafford, 299 Ill. 438,) where the court was not imposed on by perjury or collusion of the parties." (Emphasis added.) This rule is likewise enunciated in Dunning v. Dunning, 14 Ill.App.2d 242, 246, 144 N.E.2d 535 (1957), Peraza v. Tovar, 13 Ill.App.2d 405, 410, 142 N.E.2d 165 (1957), and Harms v. Harms, 323 Ill. App. 154, 158, 55 N.E.2d 301 (1944). Custody may, and frequently does, embrace provisions for religious training, and a modification of a custody order of this kind would, we think, be governed by the same rules.

█ █ Even though the decree granted plaintiff the care, custody, control, and education of the children, the provision for their religious rearing was a determination that their well-being would be best served by raising them in the Jewish faith. Both parties by written agreement had assented to this, secured the court's approval thereto, and caused the agreement to be incorporated in the decree. Why should not the same court, at a subsequent date, have given great weight to that determination, and permitted it to be modified only if it could be shown that Steven's best interests would be served by modification? It should be noted that no evidence of any kind was taken on any of the petitions which constitute part of the record of this case. There was nothing before the trial court to indicate whether the best interests of Steven could be served by bringing him up in the Jewish religion or in a different religion. No change of circumstances affecting the best interests of Steven was shown. Plaintiff demonstrated by her petitions that she herself had created this troublesome position by violating, not only her solemn agreement, but the plain condition under which custody was decreed to her. To sanction the continued violation of the decree

126

as a basis for modification was manifestly an abuse of discretion.

This squarely presents the question as to how far an agreement for the religious training of children binds the parties. We find no Illinois cases similar on the facts. In Frank v. Frank, 26 Ill.App.2d 16, 167 N.E.2d 577 (1960), where the plaintiff father appealed from an order transferring custody of the child to the re-married defendant mother, the reviewing court said (p. 19) that "implicit in the modification order changing custody from the father to the mother, is a finding that there were changed conditions since the divorce decree, and that in the light of the changed conditions, the best interests of the child were being served in entering the order." The parents were of different religious faiths, but they were in accord as to the religious upbringing of the child and no religious agreement between the parties was at issue. The chancellor evidently considered the religious issue as one factor to be weighed in determining the best interest of the child, and the reviewing court concluded (p. 20): "We cannot say that the chancellor abused his discretion in not giving the question of religion greater weight in this case."

In Smith v. Smith, 340 Ill. App. 636, 92 N.E.2d 358 (Abst. 1950), the decree provided, by agreement of the parties, that the minor child be brought up as a Catholic. Subsequently the petitioner (the father) filed a petition alleging that respondent made no provision for the child's upbringing as a Catholic, and praying that the decree be modified by awarding sole custody to petitioner. An order was entered modifying the decree as prayed for in the petition, but later that same day respondent's counsel moved to vacate the order of modification. Upon interrogation by the chancellor in open court, the respondent agreed to comply with the

127

religious provisions of the decree, and the chancellor vacated his order of modification, thus restoring the provisions of the original divorce decree. On appeal, the reviewing court held that under the circumstances the chancellor had not abused his discretion, saying: "A decree fixing the custody of the child is final on the conditions then existing and should not be changed afterward unless on altered conditions since the decree or on material facts existing at the time of the decree but unknown to the court, and then only for the welfare of the child," citing Illinois decisions.

Courts of other states have had occasion to consider and pass on the question whether agreements for the religious training of children, either in contemplation of separation of the parties or by prenuptial agreement, should be enforced. The problem has been resolved in varying ways—a reflection of its complexity.

Until Martin v. Martin, 308 N. Y. 136, 123 N.E.2d 812 (1954), the New York cases consistently held that a parental agreement as to the religious training of children was an enforcible contract. Shearer v. Shearer, 73 N.Y.S.2d 337 (Sup. Ct. 1947); Ramon v. Ramon, 34 N.Y.S.2d 100 (Dom. Rel. Ct. of City of N. Y. 1942); Weinberger v. Van Hessen, 260 N. Y. 294, 183 N. E. 429 (1932). In the Martin case a divided court affirmed an order entered on a decision of an official referee modifying a judgment whereby a complaint by the plaintiff husband, in an action to annul the marriage of the parties, had been dismissed, and the defendant wife had been granted a separation on her counterclaim, and custody of their child upon condition that he be brought up in the Roman Catholic religion and be required to attend a parochial school, in compliance with an antenuptial agreement. The modification consisted of the direction that the child be permitted to attend the church of his own choice and, if he so desired, to transfer from a parochial school which he

was attending to a public school. The husband appealed. The court, per curiam, held that there was ample evidence to support both the finding that the youngster was old enough to testify intelligently (he was twelve at the time of the hearing), and the conclusion that the modification was for his best interests and welfare. One of the justices wrote a dissenting opinion, in which another justice concurred. The opinion pointed out (pp. 812–813) that there was no finding and no testimony that enforcement of the religious-training provision of the trial court's judgment, and of the agreement which it confirmed, would damage or had damaged the boy mentally, physically, or in any other way, and that "all statements as to his becoming 'unhappy' or 'mentally disturbed' or 'ill-adjusted' " were taken from the mother's ex parte affidavit which was a mere pleading, not proof; that the referee's decision made no such finding; that the referee amended the decree solely because, as he found, "this twelve-year-old boy 'has a mind of his own,' because failure to amend the decree 'would strip him of his independent judgment in matters of this kind,' and because (so held the Referee) 'neither the mother's wishes nor the father's wishes should control what is here to be done.' True, at the end of the decision, the Referee said he was doing what 'is best for the boy' but it is impossible to read the decision as based on anything except the boy's own wishes and his supposedly mature and considered choice of a religion for himself. That was not within the Referee's competency, in the face of a Supreme Court judgment as to the place and nature of his religious training, based on a solemn prenuptial agreement." Commenting further, the dissenting judges said (p. 813): "The idea that a child of twelve is competent to make a choice binding on the Supreme Court and on his parents in such a matter, is not only contrary to our decisions, see Bunim v. Bunim, 298 N. Y. 391, 83 N.E.2d

129

848, and contrary to all human experience, but is directly opposed to the parens patriae public policy of New York [citing various New York statutes]. This sort of prenuptial agreement is enforcible like any other, unless and until its enforcement is shown to be harmful to the child." Of especial significance to the situation in the case at bar is the following comment of the dissenting judges (also p. 813): "Particularly must this be so when the agreement has been confirmed by, and written into, a judgment. Although the child's welfare is a paramount consideration in every custody case, we cannot close our eyes to fundamental principles as to judgments and agreements, and we cannot forget ancient maxims denying equitable relief to suitors *whose hands are unclean*. Respondent failed to prove that an amendment to the decree was suggested by anything except the boy's own desires. She did prove affirmatively that she herself had created this troublesome position by violating not only her solemn agreement, but the plain condition under which custody was decreed to her." (Emphasis added.) We quote at length from the dissent because it poses the question whether—or at least when—a child has the maturity to make a wise decision affecting his entire future.

In Hehman v. Hehman, 13 Misc.2d 318, 178 N.Y.S.2d 328 (Sup. Ct. 1958), the court left the choice of religion to a thirteen-year-old child, notwithstanding the terms of the separation decree incorporating the substance of an antenuptial agreement providing that two of the children of the marriage should be raised as Catholics and one as a Lutheran. In commenting on this opinion, the writer of an article in Recent Developments, Court Leaves Choice of Religion to Thirteen-Year-Old Child Notwithstanding Terms of Separation Decree Incorporating Substance of Antenuptial Agreement, 59 Colum. L. Rev. 680 (1959), referred to the earlier Martin deci-

sion and stated (p. 682) that it was "unclear whether the [Martin] decision has completely reversed the New York position on antenuptial agreements or whether the agreement would have been enforced if it had been found consistent with the child's welfare," referring to Ross v. Ross, 4 Misc.2d 399, 149 N.Y.S.2d 585 (Sup. Ct. 1956), which, two years after the Martin case, enforced a religious prenuptial agreement. In the discussion pertaining directly to the Hehman case, the author questions the wisdom of allowing the child, in effect, to dictate the religious terms of the custodial provisions (pp. 682–683): "Although the emergence of the child's will is appropriately viewed as a factor to be considered in promoting his welfare, it would seem that the possibility that the child's religious attitudes may be immature renders it inadvisable for a court to submit the matter to an official referee with instructions for so limited a scope of inquiry that the child in effect is given an absolute veto over plans that may in the total circumstances of the case appear to be in his best interests. The fact that a child's parents have separated suggests that he may need the security of more rather than less parental guidance, and should not be the sole basis for allowing him to exercise independent judgment as to matters which are normally the responsibility of parents."

Cases in other jurisdictions are indicative of the various resolutions of this problem. The majority of the courts which have considered the question have held that an agreement between the parents as to the religious training to be given their children has of itself no binding effect where other circumstances affecting the best interests of the child are shown to outweigh the parental agreement.

In Stanton v. Stanton, 213 Ga. 545, 100 S.E.2d 289, 66 ALR2d 1401 (1957), allegations of the defendant husband as to an antenuptial agreement of the parties

131

to rear the children in his religious faith were stricken by the trial court from the answer. On error for review sought by the husband, the judgment of the trial court, granting the divorce and awarding custody of the three children to the wife, was affirmed, the Georgia Supreme Court holding that the antenuptial contract would not be enforced so as to require an award of custody of the children to the husband, or as to bind the parent to whom the custody is awarded. In commenting on this case in Recent Cases of Interest, Divorce—Religious Training as an Element of a Child's Best Interest and Welfare in Awarding Custody, 20 Ga. B. J. 546 (1957–58), the writer states (p. 547): "Of course, assistance of a child psychologist or other expert would be essential if all reasonable steps are to be taken to discover whether the religion of a given parent has psychological implications if custody is awarded."

For a summary of cases on this issue from various jurisdictions, see 66 ALR2d Custody of Child—Religion as Factor, § 6, pp. 1432–36.

In 29 Harv. L. Rev. 485 (1916), in an article entitled *The Parental Right to Control the Religious Education of a Child* (frequently referred to in judicial opinions and legal writing), Friedman said (p. 493) that in circumstances of this kind, one of the most perplexing questions involved, and one on which there is perhaps the clearest conflict of authority, is how is the child's religious development to be ascertained and the possible injurious effect of a change determined. He suggested that an obvious solution would be "to hale the child before the court and to have the judge satisfy himself by an examination of the child either in open court, in chambers, or by a master in chancery or similar official under such conditions as shall give a fair opportunity to size up the child," but he was convinced that such a practice would be fraught with seri-

132

ous danger. "Perhaps nothing can be added," he continued (pp. 493–494), "to the summary [in In re Butler, 6 N. S. W. W. N. 10, 10–12 (1889)] by Judge Owen of the New South Wales Court of the evils and defects of this procedure: 'The reasoning both of the Vice-Chancellor and of the Lords Justices in that case (Hawksworth v. Hawksworth [L. R. 6 Ch. D. 539 (1871)]) satisfies my mind that any such examination would be a mere form, and might lead to injurious results. No doubt the child here is 13 years old, whereas the age of the children in the cases cited was only 9 years, but I cannot suppose that a girl of 13, unless brought up in a proselytising school, and prematurely instructed in matters of doctrinal controversy, as to which there is no evidence, can hold or be capable of forming any opinion worth considering on the matters in controversy between the two characters. Even if she had been so instructed, she might have caught the shibboleths of a party, or some of the current phrases of controversy, but of the controversy itself she could form no intelligent opinion. Subjects that held in doubt for many years the powerful and acute intellect of a Newman are outside the intellectual gauge of a girl of 13; nor can a child of that tender age, however well educated, have touched even the fringe of the learning necessary to form an intelligent opinion on so vast and complex a subject. . . . Nor do I consider upon principle, that a Judge who may be of any religion, or of no religion, is a fitting tribunal to ascertain the religious views of a child of tender years. The law, which is absolutely impartial in matters of religion, has to be administered by Judges, who, like other men, are liable to be swayed by their own views on this . . . . I also attach great weight to the opinion of the Judges in Hawksworth v. Hawksworth, that if it were known that the Court would examine a child as to its religious views, before deciding in what religion it was to be

133

brought up, a mother, or guardian, might be induced to begin prematurely to teach the child the subjects of controversy between particular churches, so as to prepare it for such examination. There are cases, no doubt, in which a child has from infancy until years of discretion been brought up in one particular form of religion, where the court may consider it dangerous to compel such child to be brought up in a different and conflicting religion, lest the diverse and conflicting teachings should make shipwreck of the child's faith, and impair its moral character. . . .' "

For an exhaustive study on this subject see Pfeffer, Religion in the Upbringing of Children, 35 B. U. L. Rev. 333 (1955). Also helpful to a consideration of this problem are: J. Smith, Contracts for Religious Education of Children, 7 Clev.-Mar. L. Rev. 534 (1958); Decisions, Domestic Relations—Award of Custody of Children to Father because of Religious and Political Beliefs of Mother, 36 Colum. L. Rev. 678 (1936); Notes, Religion as a Factor in Adoption, Guardianship and Custody, 54 id. 376 (1954); Comments, Parents' Right to Prescribe Religious Education of Children, 3 De Paul L. Rev. 83 (1953); Recent Cases, Divorce—Custody of Children—Unfitness of One Parent by Reason of Atheistic and Communistic Views, 49 Harv. L. Rev. 831 (1935–36); Comments on Recent Cases, Contempt —Enforcement of Divorce Decree—Duty to Raise Child in Particular Religion, 42 Iowa L. Rev. 617 (1956–57); Weinman, The Trial Judge Awards Custody, 10 Law & Contemp. Prob. 721, 732 (1943–44); Notes, Religion —A Factor in Awarding Custody of Infants? 31 So. Cal. L. Rev. 313 (1957–58); Recent Decisions, Judgments—Certainty—Construction of a Decree in Contempt Proceedings, 34 U. Det. L. J. 642 (1956–57); Comment, Religion as a Factor in Proceedings for Adoption and Custody of Children, 1957 U. Ill. L. F. 114; Notes, Enforceability of Antenuptial Contracts in Mixed Marriages, 50 Yale L. J. 1286 (1940–41).

In the case before us no evidence was taken; thus there is no way of knowing if Steven is exceptionally mature for his age or if he has merely the average child's understanding of theological problems. There is no showing whatever here that he had received religious instruction in any Catholic school while a student there; no showing as to the extent to which he feels committed in the choice of a religion; no showing to indicate that a change would disturb his tranquillity; nothing to suggest that a change would "make shipwreck of the child's faith, and impair its moral character." It is common knowledge that non-Catholic children attend Catholic schools for various reasons— for example, they may afford better instruction than that offered by public schools in the area; but as a rule such students do not attend the classes in religion. In the absence of any showing except the statements in her petitions, we are not impressed with plaintiff's intimation that, because Steven has been educated for several years in Catholic schools, he cannot, without injury, be transferred to a public school. We find no case in *any* jurisdiction where a court has modified a decree affecting the religious training of children pursuant to an agreement of the parties and made a part of the decree without any hearing solely upon pleadings as was done in this proceeding.

Plaintiff treats the situation as a fait accompli. As heretofore noted, she says in one of her petitions that Steven embraced the Roman Catholic religion, that "he is practicing said religion regularly, . . . that the choice of religion is guaranteed under our constitution and is extended to minors as well as adults," and that "the choice of religion of said minor children falls within the prerogative of the said petitioner." This contradiction between her position that the child should be allowed to make the choice and that "the choice of religion . . . falls within the prerogative of the said petitioner" cannot escape attention, and causes

135

one to speculate as to whether plaintiff acts on the premise that the end justifies the means. It may well be that she sincerely believes that Steven's best interest will be served by bringing him up as a Catholic, and that in so doing she is rendering to God the things that are God's; but she is overlooking the companion part of that Biblical injunction—to render to Caesar the things that are Caesar's. There is no doubt from the record presented that the choice was not that of Steven; plaintiff took advantage of her custodial position and sent him to a Catholic school in violation of the decree almost immediately after it was entered, and now seeks to justify her conduct by alleging that he has "embraced the Roman Catholic religion . . . and is practicing said religion regularly . . . ." At the time this petition was filed (May 9, 1960), Steven was ten or eleven years old; plaintiff had enrolled him at St. Nicholas School when he was only five or six. Her tactics suggest (although she never specifically says so) that she is proceeding on the theory that since Steven has attended Catholic schools for several years and is now a Catholic, a change would disturb his tranquillity, and that accordingly there should be no interference with the continued development of his religious education. In modifying the decree, the court evidently sanctioned this attitude, and without taking any evidence it ordered that Steven be enrolled in a school of plaintiff's own choosing. Since she had already made that choice, obviously she would continue his attendance in a Catholic school.

Defendant raises no question concerning the fitness and competency of plaintiff to retain Steven's custody. He asks only that she abide by her agreement and the decree, that she raise Steven in the Jewish faith and send him to a public school. When the chancellor saw fit to incorporate paragraph 14 in the decree, it must have been his considered judgment that the interest

136

and welfare of the children would best be served by its provisions. It should not be inferred from what has been said that the interests of Steven would not be well served if he were educated in another religion, but it is not within the province of the court to weigh one faith as against another. "The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." Watson v. Jones, 13 Wall. 679, 728 (1871).

We do not hold that agreements of parties with respect to the religious training of children should be enforced in all situations, but in the absence of clearly established circumstances indicating that the best interests of the child would be served by modification we do not feel that solemn agreements incorporated in a decree and sanctioned by the court should be so lightly cast aside, especially where, as here, the court had no evidence upon which to predicate the modification, and where plaintiff, by her own admissions or allegations in the pleadings, indicates her deliberate intent to disregard the agreement and decree and take the religious training of Steven in her own hands.

For the reasons indicated, we are of opinion the court was not justified, on the record presented, in modifying the decree, and therefore the order of July 1, 1960, is reversed, and the cause remanded for further proceedings not inconsistent with the views herein expressed.

Order reversed, and cause remanded with directions for further proceedings.

BRYANT, J., concurs.

BURKE, P. J., dissenting:
The chancellor did not modify the decree. He ordered that the plaintiff be allowed to enroll Steven in a school of his mother's choosing. The father has remarried. He does not seek any modification with re-

spect to the custody of the children, recognizing that the mother is a proper person to retain their custody. The order appealed from recites that the parties were present in open court and represented by counsel, and that the chancellor was "fully advised in the premises." The defendant did not bring a report of the trial proceedings. It is a matter of common knowledge that in custody and matrimonial cases the facts in dispute are frequently presented by statements of the parties and lawyers, and that the court enters orders based upon the facts so presented. In the instant case the order recites that the judge was fully advised in the premises. He could be advised by testimony, statements or both. On appeal all reasonable presumptions are in favor of the judgment order or decree appealed from and error will never be presumed. Union Drain. Dist. No. 5 v. Hamilton, 390 Ill. 487, 61 N.E.2d 343; Goldschmidt v. Chicago Transit Authority, 335 Ill. App. 461, 82 N.E.2d 357; 222 East Chestnut St. Corp. v. Murphy, 325 Ill. App. 392, 60 N.E.2d 450. It is neither the function nor the province of the reviewing court to search the record for errors, although it may search the record for grounds of affirmance. People v. Craig, 404 Ill. 505, 89 N.E.2d 409; Village of Glencoe v. Hurford, 317 Ill. 203, 148 N. E. 69. Where the record on appeal is incomplete, the court will assume that the omitted portion contained that which justified the order of the court. Any doubt arising from the incompleteness of the record will be resolved against the appellant. Vinyard v. Barnes, 124 Ill. 346, 16 N. E. 254; City of Chicago v. Tearney, 187 Ill. App. 441; Devine v. Kelly Atkinson Const. Co., 156 Ill. App. 602; Housing Authority of Gallatin County v. Church of God, 401 Ill. 100, 81 N.E.2d 500; Illinois Merchants Trust Co. v. Turner, 341 Ill. 101, 173 N. E. 52. Under the law we are required to assume that the matters

138

presented to the chancellor justified the order he entered.

In Donahue v. Donahue, 61 A.2d, 243, the Court of Errors and Appeals of New Jersey had before it an appeal from the denial by chancery of an application for an order respecting the religious training of two children. The master declined to interfere with the religious training of the children. In affirming the order of the Court of Chancery the reviewing court said (245):

"Under what circumstances, if any, a court would be justified in intervening with respect to the religious training selected by a parent having custody need not here be considered. No end of difficulties would arise if judges sought to proscribe the selection of a religious faith made by a parent having custody. See People ex rel. Sisson v. Sisson, 1936, 271 N. Y. 285, 287, 2 N.E.2d 660, 661. Intervention in matters of religion is a perilous adventure upon which the judiciary should be loathe to embark."

In the Sisson case, 271 N. Y. 285, 2 N.E.2d 660, the Court of Appeals of New York considered this subject. A reading of the case discloses that the trial court by its order sustaining a writ of habeas corpus deprived the father of a ten year old daughter of his right to control the child jointly with the mother and awarded exclusive guardianship and control to the mother. The Appellate Division, 285 N. Y. Supp. 41, modified the order by returning the child to the joint guardianship, custody and control of both parents, with the limitation that the father should not take the child from the town in which she resides without the consent of the mother, nor from her home for a longer period of time than two hours at a time and then only after personal notice to the mother of the purpose and place of the proposed visit. The Court of Appeals in directing that the order of the Appellate Division and of the trial

court be reversed and the writ of habeas corpus dismissed, said (2 N.E.2d 660, 661):

"Disagreement between the parents has arisen over the education of the child. In no way does it appear that the health or welfare of the child is in danger. In proceedings for the custody of children, the courts have reiterated that their sole point of view is the welfare of the child. The parents of this child are obviously interested only in her welfare. When they realize that for the good of the child it is necessary for them to repress to some extent the natural desire of each to have the child educated solely according to his or her point of view, the remaining sources of difficulty doubtless will disappear. The court cannot regulate by its processes the internal affairs of the home. Dispute between parents when it does not involve anything immoral or harmful to the welfare of the child is beyond the reach of the law. The vast majority of matters concerning the upbringing of children must be left to the conscience, patience, and self-restraint of father and mother. No end of difficulties would arise should judges try to tell parents how to bring up their children. Only when moral, mental and physical conditions are so bad as seriously to affect the health or morals of children should the courts be called upon to act."

The majority opinion reverses the order and remands the cause with directions to proceed in a manner not inconsistent with the views expressed. It assumes that the chancellor proceeded without being conversant with the facts. The order and the conduct of the parties indicates that he was fully advised as to all pertinent matters and that he proceeded with due regard to the law. The paramount consideration in determining custody is the welfare and best interest of the child. Nye v. Nye, 411 Ill. 408, 105 N.E.2d 300. The defendant concedes that the welfare and best interest of his son

140

is served by the custody being continued in the mother. The parties have now been separated seven years. The divorce decree embodying the agreement as to the education of the child was entered more than five years ago. The children are not parties to the agreement or the divorce decree. The majority opinion sets out the variant views of courts and authors who have spoken on this subject. It will be difficult if not impossible for a chancellor to select the view to adopt and apply to the facts presented. The record shows that the trial judge being fully advised in the premises did not disturb the decree and left the child in the care and custody of the mother. The child is receiving good care. The order should be affirmed.