Mario Pittoni, J.
The plaintiff husband, Peter Di Croce, hereinafter called Peter, has brought this action for separation and custody of their children; and the defendant wife, Gloria Di Croce, hereinafter called Gloria, counterclaims for the same relief.
I find that Peter has established by a preponderance of evidence paragraphs 1, 2 and 3 of his complaint, and paragraph 6 in part, as discussed more fully in my subsequent statement of facts. He has failed to prove to my satisfaction paragraph 4.
*1036 I find that Gloria has established by a preponderance of evidence paragraphs 4, 5, 6, 11 and 16 of her affirmative defenses and counterclaim, but that she has failed to establish paragraphs 7, 8, 10, 12, 13, 14, 17 and 19.
I.
Peter Di Croce and his wife, both Roman Catholics, were married in Our Lady of Good Counsel Church, Inwood, Long Island, in April, 1948, and of this union five children were born. The last child was born December, 1959. All five children were baptized as Roman Catholics.
In the early years of their marriage Peter and Gloria were happy, but they had some of the usual differences that arise among young married people. In his early years, Peter was a truck driver and his income was low. Later, Peter went to work in his father’s liquor store, and still later, in 1954, became an owner. His liquor business kept him working late at the store three to four evenings a week and on some other evenings he came home late because of club or fraternal activities.
Sometime in 1954 some of Gloria’s brothers, who had joined the Pentecostal Church, came from time to time into the Di Croce home and tried to teach Gloria and the children some of their Pentecostal beliefs. These visits and attempts continued and became more manifest as time progressed.
Sometime in 1957 Gloria stopped attending Catholic Mass. It was about this time that Gloria attended her first Pentecostal service with her brothers. As time passed she became more interested in the Pentecostal Church, and in the late Fall of 1959 and the Spring of 1960 she attended more Pentecostal services. As her fervor for the Pentecostal Church increased she began attending those services two or three evenings per week. To care for her children she brought in from time to time Mrs. Marakovits and Mrs. Price to “ baby sit.” Also, in the meantime, Gloria and her brothers tried to convert Peter, and in so doing cast aspersions upon the Catholic Church and the Catholic priests. Her statements to her children concerning the Catholic Church so conflicted with their fundamental knowledge that on one occasion it interfered with their receiving their first Holy Communion. Then too, Gloria raised objections to Peter’s drinking of any alcohol even at social gatherings, and also to his being in the liquor business. She said that the handling of the product of the devil was evil, that he should get out of the business, and that she would be satisfied to be poor so long as he gave up that evil business and joined her religion. *1037 She also refused to have sexual relations with Peter unless he found God her way; otherwise, it would be lust. Peter testified that because of her refusal he had no relations with her from January, 1960 until they separated on April 29, 1960.
In March, 1960 Gloria became a member of the Pentecostal Church and was baptized as such. The religious disputes between Peter and Gloria now became more intense; in fact, she said she would leave Peter and would forsake her children, if necessary, to continue her new faith. The eventual fulmination occurred on the evening- of April 29, 1960. There are charges and countercharges as to what happened that evening. Hot-headed Peter first disconnected the telephone; and later when Gloria’s brothers came to the house, he forbade their entrance and Gloria went out to speak with them. Gloria and her brothers said that Peter knocked her down. Peter says that she fell as he pulled her away from the door. Be that as it may, Gloria left that evening and stayed with her brothers overnight. She returned to her home the following day and could not get in. She went back to stay with her brothers. A day or so later, at the instigation of her brothers, she had Peter summoned to court on the criminal charge of assault. Peter is a high-strung volatile person anyway, and all this nerve-racking activity by Gloria and her brothers affected his health to the extent that he incurred a stomach disorder and was put under medical care.
Gloria has denied the truth of some of the important facts outlined above. If it were a case of her veracity as against Peter’s I would give her the benefit of the doubt. However, a good part of the facts stated was established by others. Gloria said that she was telling the truth, but that Mrs. Marakovits, Mrs. Price, Patrolman Berger and Irving T. Bergman, a highly respected member of the Bar, were all lying.
n.
Were Gloria’s change of faith the only ground for separation, that would not be sufficient (Booke v. Booke, 207 Misc. 999, mod. 1 A D 2d 782; see Diemer v. Diemer, 8 N Y 2d 206). This is the law even though a spouse’s change of religion from that had in common with the other for 10 or 11 years may cause anguish and great emotional impact upon the other. The principle, of separation of Church and State, as interpreted by some, cannot blot out from consideration the true facts of life—that the majority of our people are religious, that not all religious people worship God in the same way, and that a person’s religion and his way of worship may be so much a part of him that his spirit may be *1038 warped or broken by Ms spouse’s change to another during marriage. We must remember that marriage is more than a contract; it is more than a status; it is an intimate, beautiful relationship; it is a joining together of two human beings, husband and wife, into a nearly perfect union, severable only by death or, in civil law, by court decree. In this respect I cannot resist quoting Mr. Justice Shapiro in Hehman v. Hehman (13 Misc 2d 318, 319): “ No court can fail to be distressed hy broken marriages and ruptured homes. These cases of deep unhappiness are rendered all the more tragic when diversity of religion is one of the causes wMoh aids in destroying what should be the most joyous human relationship, and one of the most sacred of human institutions. When two people take each other as husband and wife until death do them part, the ensuing problems of deep changes in patterns of life, of widespread personality adjustments, of new and added responsibilities when children come, of financial needs as the family expands, are in themselves sufficiently exacting and trying. To add to these the great strain of difference in religion is to tempt fate.”
However, Gloria’s insistence upon her husband changing his religion, her denial of his marital rights unless he found God her way, her insistence that he give up his liquor business on the ground that liquor was the product of the devil, her attempts to change her children’s religion, and her causing Peter to be brought to court on charges of criminal assault all added up to mental cruelty, and a cruelty far more painful than physical cruelty. That these acts may have been motivated by her religious sincerity and fervor rather than any intent to injure her husband is not controlling. Sincerity, though commendable, could not transform grief into joy. The hurt was there. Peter, the plaintiff, is entitled to a judgment of separation on the second cause of action based on ‘ ‘ cruel and inhuman treatment ’ ’. (Civ. Prac. Act, § 1161, subd. 1; Weiner v. Weiner, 264 App. Div. 538, affd. 289 N. Y. 812; see Diemer v. Diemer, 8 N Y 2d 206, supra.)
My next problem is the custody of these five children, ranging in ages from 1 year to 9 years. Where, as here, the home is broken by reason of religious differences the damage to the children is incalculable; and the decision that I make is the imperfect one of a mere human being. Merely because Peter is entitled to a legal separation does not automatically entitle him to custody of the children. Gloria is a good and moral woman. No aspersions of any kind were ever cast upon her at any time during the trial. She loves her children and she wants to give them her own personal care. She has stated time and time again during the trial and during the December 22, 1960 *1039 supplemental hearing that she is willing to have the children raised as Roman Catholics and to attend the Catholic parochial school in Inwood. Peter, on the other hand, in spite of his love for his children and expressions of good intention, has put the three children, now in his custody, in a Catholic hoarding school in New Jersey. His reason for this was that having a housekeeper to care for the children would be a greater financial burden than having them in such a boarding school.
Incidently, it must be mentioned at this point that after a hearing before Mr. Justice Johnson and upon agreement of the parties, Mr. Justice Johnson directed that the three oldest children be given to the temporary custody of Peter and that the two youngest be given to the temporary custody of Gloria. This temporary arrangement was followed by Mr. Justice Gttlotta in his order for temporary alimony and temporary custody; so that at this writing the three oldest children are in the Catholic boarding school in New Jersey and the two youngest are with Gloria.
Be that as it may, I am determined to keep the family unit together as much as humanly possible. Gloria shall have custody of all five children. She can care for them. Peter has shown by his acts and declarations that he cannot. Furthermore, Peter is occupied in his business six days and four evenings per week. Gloria will be expected to let the children go to the Catholic parochial school in Inwood as soon as there is room for them in that school.
Peter, however, shall have the right to have the four oldest children with him each and every Sunday from 8:30 a.m. to 8:00 p.m. During that time he may take the children anywhere within the confines of the 10th Judicial District, i.e., Queens, Nassau and Suffolk Counties. Peter may also have the youngest child, Paul, from 2:00 p.m.-6:00 p.m. on each and every Sunday until Paul has passed the age of three. At that time Peter shall have the same rights in respect to Paul as in respect to the other children. On Thanksgiving, Christmas and Easter he may have all of them from 8:30 a.m. to 2:30 p.m.
Now, the question is: Where are they to live? Peter and Gloria own their home at 14 Lawrence Lane, Lawrence, New York, as tenants by the entirety. Peter stated that the house is now divided into two parts so that they form two apartments. The smaller apartment is now occupied by Peter’s uncle as a tenant, but without a lease, I, therefore, direct that Peter take occupancy of the apartment now occupied by his uncle and that he surrender the other or larger apartment to Gloria and the five children. The larger apartment is to be occupied by Gloria and *1040 the children. Peter shall pay for the complete upkeep of this house and shall also pay for the heat, electricity and gas.
I cannot award Gloria any alimony, but I do award her $60 per week for the support, care and upbringing of the children, and $20 per week to her for her services in caring for them.