Eli Wager, J.
This motion by plaintiff former husband is brought to (1) modify an award of child support contained in the judgment of divorce of this court entered September 5, 1975; (2) to obtain an accounting for all moneys paid to the defendant for child support and for an injunction against her using such moneys for other than the infant issue of the marriage; (3) enjoining the defendant from "attempting to change the religion of the infant issue of the marriage” and requiring religious education for the three oldest children; (4) *867 to enforce visitation provisions contained in the separation agreement; (5) requiring the defendant to advise the plaintiff of the hospitalization of any child of the parties; (6) modifying visitation by increasing the frequency of same; and for such other and further relief, etc. The motion was referred to this court for a hearing on the issues and during the course thereof the court denied the second branch of the motion for reasons that will be hereinafter discussed. The lawyers for both sides agreed that the fourth, fifth and sixth branches of the motion are amenable to settlement between them without the aid of the court or with the court’s assistance if necessary, and testimony was taken in connection therewith with the full expectation that the matter would not require resolution in the form of a judicial determination. There remain only the first and third branches of the motion which are the most troublesome and on which extensive proof was taken.
This is a marriage of more than nine years’ duration during which four daughters were born to the parties, the oldest of which is now 10 years old and the others 8, 6 Vi and 2, respectively. The judgment provided, inter alia, that custody of the children was awarded to the defendant wife, alimony was to be paid to her in the sum of $40 weekly for an annual total of $2,080 and child support in the total sum of $60 weekly totaling $3,120. The child support was allocated at $15 per week per child. The decree further provided specific days and hours of visitation and made reference to a stipulation and modification thereof between the parties without merging the same into the judgment, the terms and conditions thereof specifically to survive the judgment.
Since the entry of the divorce judgment on September 5, 1975 there have been evident changes of circumstances affecting both parties. The former wife remarried and now resides with her current husband and her four infant children of the parties. The plaintiff former husband has suffered reverses in his employment, losing a job and sustaining sharply diminished income. It is on the basis of . his diminished income that he seeks relief from that portion of the judgment which he is still obligated to meet: to wit, $60 weekly for his four children.
The evidence established that plaintiff’s annual gross income has declined $5,500 as a result of his loss of job. During the same period of time he was relieved of the obligation for the payment of alimony, which was a net out-of-pocket disbursement of $40 weekly or $2,080 per annum. It would *868 therefore appear that his diminished income is at least balanced by a diminished requirement for alimony expenditure. Indeed his reduced payment obligation corresponds in the same proportion to his loss of gross income, as did his former alimony/support payments to his former gross income.
Furthermore, when the court contemplates the cost of raising four infant children on Long Island under current economic conditions and any minimal standard of living, one must acknowledge that $15 weekly per child is a mere pittance. With this in mind, the court denied from the Bench the plaintiff’s application for an accounting from his former wife as to how that pittance was expended in behalf of each of his four children. Such a request defies common sense and this court will not allow such harassment.
Accordingly, that branch of the motion which requests a downward modification of child support is similarly denied.
There remains that portion of this motion which has caused the court great concern since it involves the present and future well-being of the four infant children of the parties, and deals specifically with their religious orientation and their upbringing. The factual pattern, though not unique by any means, presents a vexing question for this court’s determination.
The testimony discloses that the plaintiff and defendant were married at a time when she was in the early stages of pregnancy. She was born and raised a Roman Catholic, he was Jewish. Her uncontroverted testimony was that he demanded her conversion to Judaism as a precondition to their marriage. She agreed, undertook instruction in the reform branch of Judaism and was converted by a reform rabbi. The parties were married, and their four children were born and named in the traditional Jewish child-naming ceremony which involves a ritual conducted in the synagogue. During their years of marriage the husband and wife infrequently attended religious services, were not members of any Jewish congregation and at the time of their separation and divorce had not enrolled any of the children in Hebrew school. He testified that because of the restrictive hours of his visitation he was unable to take the children to religious services during his visitations with them.
Subsequent to the divorce the defendant remarried. Her present husband is a Roman Catholic and she promptly returned to the faith of her birth, disavowing her conversion to *869 Judaism. She and her second husband apparently attend church regularly and have begun to bring the children or some of them to church and instructing their children in Catholic religious practices and dogma. The father protests that by so doing she is violating their Jewish faith. He demands that they be raised in the Jewish religion and given Jewish religious instruction as they become of age. The two older children are apparently of an age suitable for religious instruction.
There was testimony by the wife that during the negotiations which terminated in a stipulation of settlement of the matrimonial action, which stipulation survives the judgment of divorce, there had been discussion between the parties and their lawyers, the essence of which was, that the father demanded the children be raised as Jews. The wife then indicated, and it was not contradicted, that she would never agree to such a provision, apparently in the knowledge that she intended to return to her Catholic faith. The parties proceeded to a divorce without such an agreement.
The question is therefore posed for the court to determine whether the father of these four girls may require their custodian mother to raise them in his faith and in the faith in which they were named, absent any agreement or decree requiring the same.
I
The father claims that the children are Jewish by reason of his prenuptial oral agreement with his former wife and by reason of their ritual induction into the Jewish faith shortly after birth. This contention compels the court to seek the guidance of religious authorities, not for the purpose of disposing of the issues before us which are wholly secular, but rather for the determination of the validity of the children’s rights, if any, to be brought up within their own religious identity. The whole body of Jewish religious law (Halacha) determines the rights, obligations and prerogatives attached to membership in that ancient faith. If not dispositive of the civil issues, it most certainly is a guide in a case such as this to a deeper understanding of the rights and obligations of the children and of their parents vis á vis the children.
As a first principle, Jewish law determines that the religious identification of children is determined by the faith of the mother. However, in the case of mixed religious parent *870 age, where the mother is gentile, the child is gentile. (Mishna, Kiddushin 66b.) It follows then, that the faith of the mother at the time of the birth of the children would control their claim to Jewish identity as a matter of birthright.
In this case the mother was a Roman Catholic who was converted into the reform branch of Judaism. There is no body of law in the reform branch of Judaism comparable to the Orthodox Halacha. Reform Jewish authorities, however, follow the spirit of Halachic law, applying the principles thereof in a much more relaxed and "liberal” fashion. Halachic law requires that a convert first undergo immersion in a Mikvah ritual bath. Talmudic authorities and commentators are clear on this requirement for ritual immersion.
"Rabbi Yochanan said: 'One can never become a convert unless he has been circumcised and immersed.’ (Yebamoth 46 A. [Talmud]) If a Gentile wishes to enter the Covenant * * * he requires circumcision and immersion.” (Maimonides, Laws of Prohibited Relations, 13:4.)
The requirement for ritual immersion applies to males as well as females. Maimonides, Laws of Prohibited Relations, 13:6 states "a convert who was circumcised and not immersed * * * is not recognized as a convert”. (See, also, Shulchan Aruch, Yoreh Deah 268:2, where it is indicated that a female who fails to undergo ritual immersion has not obtained one step in the conversion process, consequently there is no need to say that one who has not converted is not a convert.)
Reform rabbis effect conversions without ritual immersion. There is no evidence of the mother herein participating in such a ritual procedure. Under a strict Halachic interpretation, she never attained the status of a Jewish woman which would entitle her progeny to claim a Jewish heritage by birth.
It is interesting to note that under Jewish law had the religions of the parents been reversed, so as to say if the father were gentile and the mother Jewish, by birth or by strict conversion, the children would be considered Jewish since they take their faith from their mother. However, where the mother is gentile, the children are gentile.
In addition to the foregoing, we have the sworn testimony of the mother who stated that she never intended a true conscientious conversion from the faith of her birth, that she acceded to the pressure imposed upon her by the plaintiff at a time when she was in great anxiety, in the early stages of pregnancy and unmarried, that she never truly adopted Juda *871 ism as her faith, and that upon the termination of this marriage, she returned eagerly and wholeheartedly to her original Roman Catholic church. There is rabbinical authority, both orthodox and reform for the proposition that a convert who denies the intention to have become a true convert and renounces the Jewish faith to which he or she was converted and returns to the practices and beliefs of his or her prior faith, annuls the conversion by that fact alone ab initio, as having been made in bad faith.
Therefore, for whatever it is worth, the children of this mother cannot claim a Jewish birthright nor can the father claim it for them as a matter of religious law.
II
We have at issue the welfare of these four children. Even the oldest of them, age 10 at this writing, is too young to suffer the imposition of a choice of religion. The tug of war being carried on by their parents is one which does not lend itself to reasonable settlement and solution. Matters of religious faith and contention over children are two of the most troublesome sources of human conflict. We will not dispose of them for all time in this case but turn now to the civil law of our State and Nation to prescribe for the future of these children.
The rapidly escalating divorce rate in our State and Nation is a cause of great concern in that it threatens increasing erosion of family life. We live in an age when people have become casual about the marriage relationship and the stigma of divorce has diminished. With the decline of traditional views of the concept of "till death do us part” and the advent of the economic independence of women, people seem less inclined to tolerate even minor differences between husband and wife. In observing the parade of divorce proceedings through our courts, one is struck by the increasing disregard of individuals for the marital vows and the absence of a true understanding of the complexity of the marital relationship. Surely, the growth rate of divorce is also linked to the increasing freedom with which our young people are disposed to marry notwithstanding traditional, social, ethnic, geographic, economic and religious barriers. A marriage between two people of common interests, common origins and relatively similar social environments carries with it more than sufficient hazards by virtue of the simple change from the single *872 state to that of marriage. It is difficult enough to change one’s thinking from "I” to "we” given no other complicating factors. It is self-evident, however, that the greater the number of differences intruding upon the adjustment from singular to plural in the human relationship, the greater the probability of marital discord and division. When one of these differences is religious, experience teaches us that there is a greater potential for destruction of the marriage than for most other factors.
Religious intermarriage is frowned upon by the major faiths in the first instance, probably out of self-defense. Nevertheless, their opposition goes beyond narrow self-interest since we see in our society the validity of their disapproval. It is difficult for two people to make a sound and productive marriage, relatively free of conflict, where the basic difference at the outset is religion. The differences, if they do not exist between husband and wife or between their families, are most apt to arise when it comes to the rearing of children, unless one sincerely accedes to the wishes of the other or unless neither has a religious preference. The conflict over the religious upbringing of children will bring the fundamental difference into sharp focus. (Hehman v Hehman, 13 Misc 2d 318, 319.)
The four children of this marriage are in the custody of their mother. Custody is not contested, nor is there any suggestion of a lack of fitness on the part of the mother. The sole issue raised by the father is his right to require the mother, notwithstanding her own Roman Catholic religious preference to raise the children in his Jewish faith. In this effort he seeks the mandate of this court. Should this court make an order determining the religion of these four children?
It is settled law that the right "to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men” is a fundamental right of citizens of these United States. (Meyer v Nebraska, 262 US 390, 399-400; Pierce v Society of Sisters, 268 US 510; People ex rel. Portnoy v Strasser, 303 NY 539.)
This State has long pursued a policy of nonintervention in the internal management of the family in the spirit of Meyer v Nebraska (supra). Our Court of Appeals has held (People ex rel. Sisson v Sisson, 271 NY 285, 287-288): "The court cannot *873 regulate by its processes the internal affairs of the home. Dispute between parents when it does not involve anything immoral or harmful to the welfare of the child is beyond the reach of the law. The vast majority of matters concerning the upbringing of children must be left to the conscience, patience and self restraint of father and mother. No end of difficulties would arise should judges try to tell parents how to bring up their children. Only when moral, mental and physical conditions are so bad as seriously to affect the health or morals of children should the courts be called upon to act.”
In the Matter of Paolella v Phillips (27 Misc 2d 763) this court affirmed the principle of noninterference in the religious upbringing of children, there rejecting the petition of a Catholic father to direct the custodian mother, a converted Jewess, to raise the children of that marriage as Christians. Quite the parallel of the one at bar, custody was not contested and the fitness of the custodian was conceded. The court there held that the custodian (p 768) "has exclusive control over the religious upbringing of the children”. Similarly, in Mester v Mester (58 Misc 2d 790, 793), Special Term, Nassau County, declined to dictate the religious education of an infant in the absence of an agreement between the divorced parents determining the child’s religious education, nor any direction to that effect contained in the divorce decree, the court holding: "Thus, there having been neither any agreement between the parties concerning Owen’s religious education nor any direction in that respect in the divorce decree, plaintiff, as the parent having custody, is entitled to determine his religious upbringing, and all other elements of the custody determination being equal, the court would be justified in changing custody for reasons of religion only if Owen’s condition with plaintiff were 'so bad as seriously to affect [his] health or morals’, People ex rel. Sisson v. Sisson (271 N. Y. 285, 288).”
The father urges that there was a prenuptial oral agreement between the parties which controls the religious education and upbringing of the children. It is not denied by the mother that in contemplation of the marriage and especially in view of her concession to convert to Judaism, she agreed with the plaintiff that the children of the marriage would be reared as Jews. The court finds that this agreement did not contemplate the circumstances here presented. The agreement was to the effect that within the marital relationship the family would be a Jewish family. However, the agreement was *874 not projected by the parties to encompass the situation presented by a divorce.
Absent an agreement, our courts have held that a fit and proper custodian is the appropriate and responsible party for determining the religious education and orientation of minor children (Diemer v Diemer, 8 NY2d 206; Mester v Mester, 58 Misc 2d 790, supra). Antenuptial agreements regarding religious rearing of children are enforceable to the extent that they provide for the best interests and welfare of the child. Our courts have not hesitated however, to modify their terms and provisions when confronted with appropriate evidence that the welfare of the child is not best served by the premarital agreement of the parents. (Martin v Martin, 308 NY 136; Gluckstern v Gluckstern, 4 NY2d 521; Weinberger v Van Hessen, 260 NY 294, 298.)
The father has urged that the court interview the oldest child or the oldest two children (10 and 8) to determine their religious preference, in order to assist the court to come to a conclusion in this case. This court carefully observed the attitudes of mother and father during the course of the hearing. It is clear that the father utilizes his visitation time to proselytize with the children, admonishing them that they are Jews, that their mother is doing a sinful thing by taking them to her church and that they will suffer the fires of hell if they accede to their mother’s religious indoctrination. The foolishness of the father’s attitude will become more evident as these children grow in this divisive and destructive atmosphere. The father cannot expect to direct their lives by remote control, no more than he can direct the life of his former wife. The tragedy of these children being torn apart by a vindictive and insensitive father are the consequences of his own acts and he cannot redeem himself on earth or in heaven by inflicting his religious views, however sincerely held, upon these hapless infants. If he continues this campaign of terror against his own children, it is not difficult to foresee that their lives and their personalities will be irreparably damaged in this world. Accordingly, this court will decline to interview the children of such tender years since we are of the view that they are not capable, competent or free enough to make such a choice at this time. (Cf. Martin v Martin, 308 NY 136, supra; Hehman v Hehman, 13 Misc 2d 318, supra.)
This court is also concerned with the future of these four *875 infant children should one or two of the older children be allowed to make a choice of religion, which the father presumes will be Jewish because of his influence, leaving the two youngest to be educated as Roman Catholic in the faith of their mother. Can he presume such a division within a household to be beneficial to the four children? The consequences to the children and to the family of which they are now a part, in the mother’s new marital relationship, are patently perilous. The father’s love for the children should best be directed toward permitting them to mature in a home free of division and dissension. Perhaps in their maturity they will choose the father’s faith, perhaps not. It is more vital however that they not be crippled emotionally by the self-generated conflict of their parents. As Mr. Justice Shapiro observed in Hehman v Hehman (supra, p 319): "No court can fail to be distressed by broken marriages and ruptured homes. These cases of deep unhappiness are rendered all the more tragic when diversity of religion is one of the causes which aids in destroying what should be the most joyous human relationship, and one of the most sacred of human institutions. When two people take each other as husband and wife until death do them part, the ensuing problems of deep changes in patterns of life, of widespread personality adjustments, of new and added responsibilities when children come, of financial needs as the family expands, are in themselves sufficiently exacting and trying. To add to these the great strain of difference in religion is to tempt fate.”
Finally, the court finds that the case of Di Croce v Di Croce (27 Misc 2d 1035), upon which plaintiff relies, is inapposite to the case at bar. In Di Croce, the father and mother were both Roman Catholics and their five children were born and baptized in their church. Twelve years after the marriage the mother alone converted to another religion. Although awarding the husband a judgment of separation, Mr. Justice Pittoni awarded custody of the five children to the mother for practical reasons alone, principally the need for custodial care which the father’s employment did not permit him to accord them. However, in that case, under the peculiar facts recited, the children did not assume the religion of their custodian mother. She was directed to permit and assist the father to raise and educate the children as Roman Catholics. The distinctions between Di Croce and the case at bar are self-evident, since no parallels can be drawn.
*876 III Conclusion
In sum, the court finds that the defendant mother is a fit and proper custodian for the four infant children of the marriage of the parties, that they are neither Jewish nor Roman Catholic, that the custodian mother is not engaged in "changing the religion of the children” and that there is no agreement between the parties binding upon the mother so as to direct or control the religious education and upbringing of these children. It is to be hoped that the mother, as a fit, proper and moral custodian for these children, would choose an appropriate course of religious instruction for them, consistent with their welfare and their best interests and with appropriate regard and respect for their father and his faith.